## WARNER R. WADDELL AND JEANETTE I. WADDELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1026-83.        Filed April 28, 1986.

*Kenneth M. Barish, Anita G. Paleologos, Arthur H. Boelter,* and *Henry W. Walther,* for the petitioners.
*Larry N. Johnson,* for the respondent.

PARKER, *Judge*: Respondent determined a deficiency of $4,833 in petitioners' 1980 Federal income tax and an addition to tax of $1,208 under section 6651(a).[1] At issue in this case are various deductions and an investment tax credit claimed by petitioners in regard to their acquisition of four electrocardiogram (ECG) analysis computer terminals pursuant to franchise agreements with Comp-U-Med, the equipment's manufacturer. The issues for decision are:

(1) Whether petitioners' computerized ECG terminal franchise venture was an activity engaged in for profit;

(2) Whether, and if so to what extent, certain payments petitioners made to Comp-U-Med in 1980, denominated as royalties, are deductible expenses;

(3) Whether for purposes of depreciation and the investment tax credit, petitioners' computerized ECG terminals were placed in service during 1980;

(4) Whether, and if so to what extent, petitioners' purchase money note, allocated to the computerized ECG terminals, was a "true debt" for Federal tax purposes;

(5) Whether, and if so to what extent, petitioners were "at risk" with respect to their computerized ECG terminal venture, within the meaning of section 465; and

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(6) Whether petitioners' failure timely to file their 1980 Federal income tax return was due to reasonable cause and not due to willful neglect within the meaning of section 6651(a)(1).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference.

Petitioners, husband and wife, resided in Portland, Oregon, at the time they filed their petition in this case. Petitioners filed a joint Federal income tax return (Form 1040) for 1980. Their return preparer, an accountant, signed the return on April 13, 1981; Warner R. Waddell signed the return on May 5, 1981;[2] and the return was filed in respondent's Ogden, Utah, Service Center on May 7, 1981.

Electrocardiography is a diagnostic process for studying the functioning of the heart. A device known as an electrocardiograph is used to measure the electrical activity of the heart, and this measurement is reported on a tracing or strip chart, called an electrocardiogram (ECG). First developed in the late 19th century, electrocardiography had by 1940 become an accepted diagnostic technique within the medical profession.

During the 1960's, several medical institutions (including the U.S. Public Health Service, the Veterans' Administration, and the Mayo Clinic) developed systems for using computers to receive and analyze electrocardiograms. After the Public Health Service had made public its program for "computerized" electrocardiography in 1969, many private companies began developing and marketing computerized ECG systems. The early 1970's saw a gradual increase in the accuracy of the computer analyses, due to improvements in the software (programming). By the middle to late 1970's, computerized electrocardiography was well accepted in the medical community, and there were several established companies offering computerized ECG systems to various segments of the health care industry. The basic technology for the ECG equipment that performs the electrocardiogram

---

[2]Mrs. Waddell's signature on the return is undated.

has remained essentially unchanged for the past 50 years. As noted above, the development has been in computerized analysis or interpretation of the electrocardiogram. Although there have been continuing improvements in the computer software to perform this analysis, no fundamental, radical changes in the hardware for computer ECG analysis was anticipated in the period of the early 1980's. Changes in the ECG machines and computer terminals usually related to improvements to make them easier for the doctor or technician to use.

Comp-U-Med, Inc., is a company specializing in technology for medical diagnostic systems. Comp-U-Med, Inc., designs, develops, and manufactures computer-based electronic systems for use by physicians, clinics, hospitals, health-maintenance organizations (HMO's), and industrial and corporate health care facilities. Comp-U-Med Systems, a wholly owned subsidiary of Comp-U-Med, Inc., was formed to facilitate sales of Comp-U-Med's product by offering franchises to individual investors. For simplicity, we shall treat Comp-U-Med, Inc., and Comp-U-Med Systems as a single company (Comp-U-Med).[3]

Comp-U-Med's principal product is its System 107 Computer ECG Terminal, a device used to administer an electrocardiogram, transmit the data to a mainframe computer for analysis, and then receive back the computer's analysis or interpretation. This model, essentially an updated, mass-produced version of its earlier prototype Model 103, was first sold in 1978.[4] From 1978 through 1982, Comp-U-Med marketed its System 107 exclusively through its franchise program, as described below. Comp-U-Med has sold no franchises since the early spring of 1982.

During the middle to late 1970's, when Comp-U-Med was formulating its marketing plans for its System 107 terminals, venture capital was scarce. Comp-U-Med was unable to obtain ordinary equity financing. The computer industry had traditionally used third-party lessors as a technique for

[3]Neither Comp-U-Med, Inc., nor Comp-U-Med Systems is a party to this case, and the evidence, both documentary and testimonial, consistently treats the activities of these separate entities as the activities of a single company.

[4]Comp-U-Med sold approximately 35 of its prototype Model 103 ECG terminals during 1976 and 1977.

financing computers. However, because it was new to the computerized ECG industry and had no track record, Comp-U-Med believed it could not use conventional third-party financing (i.e., sale and leaseback). Comp-U-Med wanted quickly to capture as large a market share as possible, which meant making the ECG terminals available with a minimal financial commitment by the various users. As an innovative financing method and to facilitate its ambitious marketing goals, Comp-U-Med devised its franchise system: Comp-U-Med would sell its terminals to individual investors (largely on credit), giving a right of access to its central processing (mainframe) computers on a fee-for-use basis. The individual investors would be primarily responsible for placement of their terminals with actual users (physicians, clinics, hospitals, etc.), which was to be done through independent medical equipment distributors. The franchise contemplated that the users would pay a modest up-front charge and then pay for ECG's administered and analyzed through the Comp-U-Med terminals and computers on a fee-for-use basis. Comp-U-Med would directly bill and receive the payments from the users. Comp-U-Med would then distribute the proceeds as follows: to itself for shipping, processing and billing fees, to the distributors for their commissions, and to the investors for their net income. After all expenses were paid by Comp-U-Med, 50 percent of any net income to an investor was retained by Comp-U-Med and credited against the investor's purchase obligation.

In the latter half of 1980, petitioners contacted Michael O. Murphy, a tax attorney, regarding a notice of deficiency they had received for their taxable year 1977. Petitioners also sought estate planning and investment advice from Mr. Murphy. Petitioners had been operating a business called Western Business Builders, Inc., for more than 30 years. Petitioners' 1979 income was about $80,000. Petitioners had a net worth of about $750,000 (exclusive of home, automobiles, and furnishings), including extensive holdings of rental real estate. Petitioners wanted to diversify their holdings; they were also interested in the tax shelter aspects of various potential investments.

Mr. Murphy first became aware of Comp-U-Med in September of 1980, when he received a telephone solicita-

tion from Control Financial Group (CFG), an investment firm. He subsequently received and reviewed a copy of Comp-U-Med's franchise offering circular. Mr. Murphy had an associate investigate the literature and representations Comp-U-Med provided with its offering circular. Specifically, the associate contacted various doctors and hospitals to confirm the potential market for Comp-U-Med's computerized ECG terminals on the fee-for-use basis contemplated in its offering and to attempt to corroborate Comp-U-Med's usage projections. The associate found many physicians who were interested in ECG terminals under the terms of Comp-U-Med's marketing arrangements, including several doctors who specifically had heard of Comp-U-Med. Mr. Murphy and his associate thought that an outpatient clinic would make maximum use of the terminals; they also recognized that use levels by private physicians were dependent upon the nature of their practices. Neither Mr. Murphy nor his associate was aware of Comp-U-Med's actual marketing strategy—focusing on low volume users—until after petitioners had acquired their franchises and terminals.

Mr. Murphy and petitioners considered various other investments but settled on Comp-U-Med franchises. Mr. Murphy recommended and petitioners chose Comp-U-Med because they all felt that it represented a realistic profit potential independent of the expected tax benefits. Petitioners also thought that equipment leasing would diversify their investments; moreover, they were attracted to the Comp-U-Med terminals because of their aura of "high technology."

In late December of 1980, petitioners purchased four Comp-U-Med franchises. On December 22, 1980, in accordance with the instructions in Comp-U-Med's Franchise Offering Circular, petitioners executed an application for franchise, a personal financial statement, a franchise agreement for four franchises, a purchase order for four terminals, and a promissory note. On the same day, petitioners executed an equipment distribution agreement and a form "Equipment Delivery Instructions" for each of the four terminals. Pursuant to the offering circular, petitioners paid Comp-U-Med a total of $24,000, $6,000 per franchise, by a

check drawn on December 23, 1980. The stated allocation of the $6,000 advance payment per franchise was a "franchise fee" of $500, a downpayment on the terminal of $2,500, and a "first year royalty fee" of $3,000. Comp-U-Med approved petitioners' franchise application on December 30, 1980.[5]

Each of petitioners' Comp-U-Med franchises included the purchase of a System 107 Computer ECG Terminal for a stated purchase price of $27,500, with $2,500 paid upon execution of the franchise agreement and the balance of the purchase price ($25,000) payable in accordance with the terms and conditions of the franchise agreement and promissory note. Petitioners' promissory note was in the aggregate amount of $100,000 (four terminals). The note, denominated as "Recourse," was for an initial term of 7 years and called for interest at 6 percent per annum on the unpaid principal balance. At the end of the initial term, the note called for payment of any accrued, unpaid interest and all unpaid principal, but if payments were then current, petitioners could extend the note for an additional 7-year term (the extension term). Moreover, the note provided that at any time during the extension term, petitioners could convert the note from "full-recourse" to nonrecourse by paying $1,000 (per franchise/terminal) to be applied against principal.

The note called for a minimum payment of $1,500 per year (per franchise/terminal), due within 30 days of the note's anniversary date, to be applied against accrued, unpaid interest. Any other payment under the note was to come only from net exploitation receipts. Petitioners were obligated to pay Comp-U-Med out of the net receipts (gross receipts less expenses) from their exploitation of the terminal (a) any accrued, unpaid interest and (b) 50 percent of their additional net receipts, if any, which was to be credited against principal.[6] If during the extension term petitioners converted the note to nonrecourse, there were no minimum payments due. Instead, petitioners were required

---

[5]Sometime in 1981, Comp-U-Med changed the price and financing terms for its terminals and franchises. These later franchises called for a total "franchise fee" and "first year royalty" of $4,000, a down payment on the terminal of $3,000, and a 9-percent promissory note for $29,000 with annual minimum payments of $1,800.

[6]Petitioners were not permitted to credit any of Comp-U-Med's 50-percent share of additional net receipts against their future minimum payments.

to pay all their net receipts against accrued interest and 75 percent of any additional net receipts against principal. It is not clear that the $1,500 minimum payments would be due during the extension term even if petitioners did not elect to convert the note to nonrecourse. The minimum payment requirement in the note seems to be limited to just the initial term of 7 years.

Comp-U-Med could accelerate payment of all principal and unpaid accrued interest if petitioners failed to make the required payments (from net exploitation proceeds) on the note. Moreover, if petitioners defaulted on any of their obligations under the franchise agreement, Comp-U-Med could also accelerate payment of principal and unpaid, accrued interest. If petitioners defaulted while the note was recourse, Comp-U-Med could proceed against the security or petitioners' personal assets to collect any amount due. If petitioners defaulted while the note was nonrecourse, Comp-U-Med could only proceed against the security to collect any amount due. The offering circular represented that after the initial 7-year term, the terminal would be worth approximately 10 percent of its initial "purchase price," or $2,750.

Petitioners' franchise agreement with Comp-U-Med provided for an initial term of 7 years, with an option to renew for an additional 7 years upon proper notice and payment of a $200 renewal fee (per franchise), but only if petitioners were not in default under the franchise agreement. Under the agreement, petitioners were to purchase one System 107 Computer ECG Terminal for each franchise.[7] The franchise agreement gave petitioners a nonexclusive right to use Comp-U-Med's name, logo, methods, systems, and techniques in operating their franchises, i.e., maintaining and operating the terminals to generate lease revenues from physicians, clinics, or other health care organizations. Comp-U-Med provided petitioners with suggested lease forms, rates, and commissions. Comp-U-Med also furnished petitioners the accounting standards, manuals, and procedures

---

[7] The franchise agreement called for purchase of the terminal by a downpayment of $2,500. and the $25,000 balance financed under the terms of the promissory note, described above, which the franchise agreement incorporated by reference.

they were required to maintain and follow in keeping records for their ECG terminal and franchise.

Under the franchise agreement, Comp-U-Med agreed to provide unlimited use of its mainframe computer facilities via telephone for petitioners or users of their equipment at a royalty charge of 50 cents for each ECG processed by Comp-U-Med's computers. However, this fee was waived for the first year in favor of a flat "royalty" of $3,000 per franchise prepaid at the time the agreement was executed. During the renewal term, if the promissory note had been paid, Comp-U-Med was to charge petitioners its then-current ECG computer processing rates. Comp-U-Med also agreed to provide up-to-date computer programs for interpreting electrocardiograms on its computers for use by petitioners or their customers. At some time subsequent, Comp-U-Med obtained a WATS long-distance telephone line, for which it charged a fee of $1 for each ECG interpretation performed.

Comp-U-Med also agreed to provide billing services, sending out monthly statements to users, receiving payments, and distributing cash received. For this service, Comp-U-Med charged $5 per franchise per month plus 5 cents per ECG. Comp-U-Med's computers provided the information concerning the number of uses per month, and the billing rates used were those recommended by Comp-U-Med unless petitioners directed otherwise. Unless petitioners requested in writing another disbursement schedule, receipts were to be credited in the following order of priority: (1) Shipping and delivery charges;[8] (2) Comp-U-Med's ongoing franchise fees, consisting of royalty fees and billing service fees; (3) commissions (if any) for the distributor; (4) interest on the purchase money note (retained by Comp-U-Med); (5) principal on purchase money note of one-half of the balance of the net monthly receipts (also retained by Comp-U-Med); and (6) the other half of the balance of the net monthly receipts to petitioners.

Under the agreement, Comp-U-Med undertook various other obligations. Comp-U-Med agreed to train any person (whom it approved) designated by petitioners in operating

---

[8]The franchise agreement called for Comp-U-Med to ship petitioners' terminals at petitioners' expense to the destinations they designated.

and handling the terminal and in supervising the use of the machine and system to administer and interpret an ECG. Comp-U-Med also agreed to allow petitioners or their designees to review and update their training and to avail themselves of new procedures and practices developed by Comp-U-Med. Comp-U-Med warranted that the computer ECG terminal would be free from all defects in workmanship and materials for a period of 5 years after the original purchase and that no charge would be made for parts and labor during the warranty period. Petitioners were required to return defective equipment to Comp-U-Med at their own expense. Comp-U-Med agreed to return the serviced equipment to petitioners or their customers at its own expense. Comp-U-Med agreed to provide $1 million product liability coverage naming petitioners and providing them with a Certificate of Insurance, to insure petitioners against product liability from use of the terminal purchased from Comp-U-Med. Finally, Comp-U-Med agreed to replace the terminal at a cost of 15 percent of the original "purchase price" of $27,500 (e.g., $4,200) in the event the terminal was stolen, lost, destroyed, or damaged.

Petitioners also undertook other obligations under the franchise agreement in addition to their purchase obligation under the promissory note. Petitioners agreed to operate their franchises according to Comp-U-Med's plans, systems, and methods, which Comp-U-Med might periodically establish, revise, and improve. Petitioners agreed to indemnify Comp-U-Med against any claim or liability arising from the operation of their franchises, including any of petitioners' third-party agreements, and from their use or disclosure of Comp-U-Med's intangibles (company name, trademark, information, etc.). Petitioners acknowledged Comp-U-Med's exclusive right, title, and interest in and to its intangible assets and promised not to impair any part of these rights. Petitioners promised to pay all taxes and all other governmental fees arising from their franchises and to otherwise comply with all applicable laws and regulations. Petitioners agreed to obtain a policy of liability insurance covering their franchises and to provide their own workmen's compensation insurance or similar coverage to protect themselves and their employees. Finally, petitioners agreed to

maintain accurate books and records of their franchise revenues, which Comp-U-Med had a right (at its own expense) to have audited.

The franchise agreement listed various acts that would constitute a default by petitioners, including: (1) A continuing failure to make any required payment or to perform any required act 15 days after notice from Comp-U-Med of such failure; (2) the attachment of any involuntary lien, not promptly removed, of $500 or more upon any of petitioners' business assets or property; (3) various acts of insolvency by petitioners, commencement by petitioners of an insolvency proceeding (including bankruptcy or receivership), or their failure to obtain dismissal of an involuntary proceeding within 60 days after its filing; (4) conduct of their franchise that adversely affects the goodwill and reputation of Comp-U-Med or its product; (5) any transfer of any portion of the franchise rights without Comp-U-Med's prior written consent; and (6) failure to comply with all the terms of the franchise agreement and all other agreements, whether oral or written, between them and Comp-U-Med. Although the franchise agreement provided no express remedy upon default (as defined therein), the promissory note allowed Comp-U-Med at its option to accelerate all principal and interest in the event of petitioners' default under the franchise agreement.

To secure performance of their obligations under the promissory note, petitioners granted Comp-U-Med a security interest in the terminals and in any leases petitioners obtained. The security interest attached on the later of the execution of the agreement or petitioners' acquisition of rights to the collateral (terminals and leases). Petitioners agreed to execute a Form UCC-1 Financing Statement for filing with the California secretary of state to evidence the security interest granted to Comp-U-Med and to execute and deliver to Comp-U-Med any other documents it deemed necessary to protect its security interest. Petitioners executed the Form UCC-1 Financing Statement on January 26, 1981. Prior execution of the financing statement was not a condition precedent to petitioners' right to direct delivery by Comp-U-Med of their terminals.[9]

---

[9]The franchise agreement and related documents are somewhat ambiguous, not indicating clearly whether petitioners were required to execute the financing statement before any

On December 22, 1980, petitioners executed equipment distribution agreements for each of their terminals, with the following medical equipment distributors:[10] Dr. Medical (David Rousett) (Terminal No. 72146); Cobb Bennett (Terminal No. 72147); Cardiac Systems (Pamela Fyffe) (Terminal No. 72148); and A/C Medical (Bill Carroll) (Terminal No. 72149). Petitioners agreed to consign a terminal to each distributor, each of whom promised to use his or her best efforts to place the terminal with a user. Petitioners agreed to have the terminal drop shipped to the distributor, and the distributor agreed to accept consignment of the equipment and to examine it upon receipt to ensure that it was free from defects and suitable for immediate use. Petitioners agreed to pay each distributor a commission for placing the terminal with a user in the amount of the first and last months' minimum use fee plus 10 percent of gross revenues from the user during the term of the equipment distribution agreement. Also on December 22, 1980, petitioners executed forms entitled "Equipment Delivery Instructions" for each of their terminals, informing Comp-U-Med of the identity of the distributors, listed above, and directing Comp-U-Med to retain the terminals until it received a request for shipment.

On December 22, 1980, petitioners entered into a management agreement with Medical Management Group (MMG) to obtain management services in connection with the operation of their Comp-U-Med franchises. These management services included: (1) Securing and publishing a fictitious business name statement; (2) securing various necessary bank accounts; (3) securing stationery and business cards relating to franchise operations; (4) securing any applicable resale permits from the Board of Equalization or other applicable Government agencies; (5) establishing a book keeping system relating to operations of the franchise; (6)

---

delivery of their terminals. Paragraph 5.1.6 of the franchise agreement indicated that the franchisee was to execute and deliver the UCC-1 prior to delivery of the equipment, and paragraph 7.1 provided that Comp-U-Med "may" delay delivery until after compliance with that requirement. Despite the agreement's seeming ambiguity, the parties' understanding and course of conduct were quite clear that execution and delivery of the UCC-1 were not prerequisites to delivery of the terminals. Neither petitioners nor their investment advisor nor Comp-U-Med understood the agreement to impose such a requirement. We decline respondent's invitation to so construe the agreement, contrary to the parties' understanding of it.

[10]It appears that petitioners selected the various distributors from a list of distributors provided to them by Comp-U-Med.

assisting in the supervision of equipment placement; and (7) corresponding with Comp-U-Med. Petitioners chose to contract with MMG rather than directly manage their franchises because they had no experience in leasing medical equipment and because they were busy managing their business and their investment real estate. MMG was independent of Comp-U-Med, although it appears that it was affiliated with CFG, the investment firm that sold many of Comp-U-Med's franchises. CFG was also independent of Comp-U-Med.

The term of petitioners' management agreement with MMG was 1 year, commencing December 24, 1980. Petitioners paid MMG its management fee of $750 per franchise, or a total of $3,000, by a check dated December 23, 1980. The management agreement was renewable annually at MMG's then-applicable renewal fee ($150 in 1980).

Petitioners subsequently changed distributors for their terminals on several occasions, as follows:

| Terminal number | Medical | Date agreement signed by petitioners |
|---|---|---|
| 72147 | Inter-Med (Randy Eggert) | 11/04/81 |
| 72147 | EKG Computer Systems | 3/01/82 |
| 72147 | Internal Related Systems | 10/25/82 |
| 72148 | Warner Associates | 4/08/82 |
| 72149 | Carolina Medical Support Systems | 11/04/81 |

In each case, MMG initiated the change of distributors; petitioners merely signed the necessary documents.

To generate sufficient net revenues even to meet the minimum annual payments of $1,500 (per franchise/terminal), much less to make any reduction of the stated $25,000 principal, petitioners had to place their terminals with users.[11] Petitioners' terminals were first placed with users in 1982, as follows:

---

[11]Although it appears that some of petitioners' terminals may have earned some revenue through "demonstration pools" used by Comp-U-Med in its marketing to prospective users, these amounts were minimal and not nearly sufficient to meet the $1,500 minimum annual payment.

| Terminal | Distributor | User | Date user signed user agreement | Date terminal delivered | First ECG performed |
|---|---|---|---|---|---|
| 72146 | - - - | General Foods | 2/17/82 | 6/03/82 | July 1982 |
| 72147 | ECG Computer Systems | Lewis Loskovitz, MD | 1/27/82 | - - - | Apr. 1982 |
| 72147 | Internal Related Systems | Otto F. Swegal, MD | 8/12/82 | 9/09/82 | Sept. 1982 |
| 72148 | Warner Associates | Charles F. Stringer, MD | 2/19/82 | 4/01/82 | July 1982 |
| 72149 | - - - | Alcoa | 2/09/82 | 5/13/82 | Aug. 1982 |

Petitioners' terminals generated the following revenues and expenditures:

1981

| Terminal | Number of ECG's | Gross revenues[1] | Net revenues[2] | Amount credited against interest on note[3] |
|---|---|---|---|---|
| 72146 | 0 | $75 | $75.00 | $75.00 |
| 72147 | 0 | 75 | 75.00 | 75.00 |
| 72148 | 0 | 75 | 75.00 | 75.00 |
| 72149 | 0 | 75 | 75.00 | 75.00 |

1982

| Terminal | Number of ECG's | Gross revenues[1] | Net revenues[2] | Amount credited against interest on note[3] |
|---|---|---|---|---|
| 72146 | 178 | 1,316 | 698.00 | 281.60 |
| 72147 | 70 | 689 | 87.15 | 75.00 |
| 72148 | 98 | 1,073 | 470.90 | 145.90 |
| 72149 | 368 | 1,840 | 1,069.60 | 979.60 |

[1]Gross revenues reflect accounts receivable as well as cash receipts.
[2]Gross revenues minus cash expenditures.
[3]Cash receipts minus cash expenditures.

As of the end of 1982, none of petitioners' franchises had generated enough net revenues to reduce *any* of the stated principal amount on the purchase money notes for their four terminals. None had earned enough even to meet the required minimum payments. At the end of 1982, Comp-U-Med's records showed that of 1,272 terminals/franchises sold, there had been no reduction in principal for 870 or 68 percent of that number. As to the 402 terminals/franchises for which Comp-U-Med's records showed some reduction in principal, the reduction was less than $1,000 in most instances.

In its offering circular, dated February 1, 1980, Comp-U-Med recommended that its franchisees charge their users a

minimum monthly rental (including 14 free ECG's) of $98 and the following additional ECG processing fees:

| ECG's/month | Price per ECG |
|---|---|
| First 14 | Included free |
| Next 15 - 50 | $7 |
| Next 51 - 100 | 5 |
| Next 101 - 200 | 4 |
| Next 201 - up | 3 |

Petitioners' user agreements called for the following ECG fees:

| Terminal | User | Fee |
|---|---|---|
| 72146 | General Foods | $5.00 per ECG, first 65 per month; $4.00 per ECG thereafter |
| 72147 | Lewis Loskovitz, MD | - - -[1] |
| 72147 | Otto Swegal, MD | 8.33[2] |
| 72148 | Charles Stringer, MD | 8.33[2] |
| 72149 | Alcoa | 5.00 |

[1]The user agreement with Dr. Loskovitz called for a free 30-day trial period and billing of the normal first and last months' minimum-use fees 30 days after installation. From the franchise report for Terminal 72147 for this period, it appears that Dr. Loskovitz decided not to continue the arrangement after completion of the 30-day trial period.

[2]These agreements called for a minimum monthly payment of $125, which included 15 ECG's at no additional cost.

Citing the 1979 revisions of a report on computerized electrocardiography prepared by Arthur D. Little, Inc., for the U.S. Department of Health, Education and Welfare, Comp-U-Med's offering circular claimed a nationwide average of 1,500 ECG's per year per user. The 1979 revisions of the Little report, which Comp-U-Med used in preparing its offering circular, showed, however, the following information:

USE OF COMPUTER ASSISTANCE IN
THE UNITED STATES
*1978*

| Type of user | Number | Volume of ECG's processed | Average per user |
|---|---|---|---|
| Hospitals, more than 300 beds | 250 | 3.1 million | 12,400 |

| Type of user | Number | Volume of ECG's processed | Average per user |
|---|---|---|---|
| Hospitals, 100 to 300 beds | 550 | 1.6 million | 2,909 |
| Hospitals, less than 100 beds | 1,200 | 1.3 million | 1,083 |
| Physicians' offices | 3,500 | .6 million | 171 |
| HMO's, screening facilities, ambulatory | 350 | .5 million | 1,429 |
| Total | 5,850 | 7.1 million | 1,214 |

The original Little report and its 1979 revision also report the following data for earlier years:

1977

| Type of user | Number | Volume of ECG's processed | Average per user |
|---|---|---|---|
| Hospitals, more than 300 beds | 1,000 | 2.6 million | 3,800 |
| Hospitals, 100 to 300 beds | | 1.2 million | |
| Hospitals, less than 100 beds | 900 | 1.2 million | 1,333 |
| Physicians' offices | 2,400 | 1.0 million | 417 |
| HMO's, screening facilities, ambulatory | 250 | .3 million | 1,200 |
| Total | 4,550 | 6.3 million | 1,385 |

1976

| Type of user | Number | Volume of ECG's processed | Average per user |
|---|---|---|---|
| Hospitals (all sizes) | 1,500 | 3.5 million | 2,333 |
| Private physicians' offices | 900 | .5 million | 556 |
| HMO's, screening facilities, ambulatory | --- | .3 million | --- |
| Total | 2,400 | 4.0 million[1] | 1,667 |

[1]Excludes the ECG's performed by HMO's and screening facilities because of the indeterminate number of users.

In its offering circular, Comp-U-Med also claimed substantial use experience of its own, identified as extrapolations of Comp-U-Med's average monthly volumes through December 31, 1979, as follows:

|                        | ECG's per year |
|------------------------|----------------|
| Average per terminal   | 550            |
| 46 percent of terminals | under 200     |
| 29 percent of terminals | 200 - 600     |
| 18 percent of terminals | 600 - 1200    |
| 7 percent of terminals  | over 1200     |
| Highest use per terminal | 5,000        |

During the relevant periods, Comp-U-Med's franchise program resulted in the sales, placements, and ECG activities shown in the table on page 866.

Comp-U-Med's franchise program contemplated that Comp-U-Med would not be actively involved in the actual placement of its franchisees' terminals, limiting its efforts to providing franchisees with a list of existing medical equipment distributors. Comp-U-Med soon discovered that this arrangement did not work too well, so it began training people to act as independent contractors to be compensated strictly on a commission basis. In March of 1983, Comp-U-Med began making placements directly through company employees, hiring eight of its most successful independent distributors for this purpose. Although Comp-U-Med still uses some independent distributors, it plans to eliminate them and use a direct sales force of company employees.

As of March 15, 1982, Comp-U-Med claimed that on the average its terminals had been placed with users within 12 months after sale. Comp-U-Med, however, expected the time interval between sales to the investor and placement with a user to increase significantly due to its successful sales program. The Comp-U-Med placement and usage data for the month ending November 22, 1982, indicated the following:

*Analog[1] terminals*

| Number of placements | Range of ECG/month | Average ECG/month | Percent of total placements | Cumulative percent of total placements |
|----------------------|--------------------|-------------------|-----------------------------|-----------------------------------------|
| 153 | 0     | 0    | 14.3 | 14.3 |
| 406 | 1-10  | 5.5  | 38.0 | 52.3 |
| 231 | 11-20 | 15.5 | 21.6 | 73.9 |
| 125 | 21-30 | 25.5 | 11.7 | 85.6 |
| 58  | 31-40 | 35.5 | 5.4  | 91.0 |
| 40  | 41-50 | 45.5 | 3.7  | 94.8 |
| 15  | 51-60 | 55.5 | 1.4  | 96.2 |
| 8   | 61-70 | 65.5 | 0.7  | 96.9 |
| 13  | 71-80 | 75.5 | 1.2  | 98.1 |

| Number of placements | Range of ECG/month | Average ECG/month | Percent of total placements | Cumulative percent of total placements |
|---|---|---|---|---|
| 3 | 81-90 | 85.5 | 0.3 | 98.4 |
| 17 | more than 90 | 100.0[2] | 1.6 | 100.0 |

### Digital terminals

| Number of placements | Range of ECG/month | Average ECG/month | Percent of total placements | Cumulative percent of total placements |
|---|---|---|---|---|
| 54 | 0 | 0 | 7.8 | 7.8 |
| 293 | 1-10 | 5.5 | 42.5 | 50.3 |
| 137 | 11-20 | 15.5 | 19.6 | 70.1 |
| 83 | 21-30 | 25.5 | 12.0 | 82.2 |
| 43 | 31-40 | 35.5 | 6.2 | 88.4 |
| 24 | 41-50 | 45.5 | 3.5 | 91.9 |
| 15 | 51-60 | 55.5 | 2.2 | 94.1 |
| 8 | 61-70 | 65.5 | 1.1 | 95.2 |
| 7 | 71-80 | 75.5 | 1.0 | 96.2 |
| 7 | 81-90 | 85.5 | 1.0 | 97.2 |
| 19 | more than 90 | 100.0[2] | 2.8 | 100.0 |

### All terminals

| Number of placements | Range of ECG/month | Average ECG/month | Percent of total placements | Cumulative percent of total placements |
|---|---|---|---|---|
| 207 | 0 | 0 | 11.8 | 11.8 |
| 699 | 1-10 | 5.5 | 39.7 | 51.5 |
| 368 | 11-20 | 15.5 | 20.9 | 72.4 |
| 208 | 21-30 | 25.5 | 11.8 | 84.2 |
| 101 | 31-40 | 35.5 | 5.7 | 90.0 |
| 64 | 41-50 | 45.5 | 3.6 | 93.6 |
| 30 | 51-60 | 55.5 | 1.7 | 95.3 |
| 16 | 61-70 | 65.5 | 0.9 | 96.2 |
| 20 | 71-80 | 75.5 | 1.1 | 97.4 |
| 10 | 81-90 | 85.5 | 0.6 | 98.0 |
| 136 | more than 90 | 100.0[2] | 2.0 | 100.0 |

[1]The labels "Analog" and "Digital" describe the terminals' modes of telephone transmission, as discussed in the text below.
[2]Comp-U-Med's records do not show the actual figures but rather assume an average of 100 ECG's per month.

This most recent data also showed the following average (annualized) number of ECG's per terminal:

| Type of terminal | Number of terminals placed | Average ECG per terminal (annualized) | Number of placed terminals in use | Average ECG per terminal (annualized) |
|---|---|---|---|---|
| Analog | 1,069 | 193 | 916 | 225 |
| Digital | 690 | 224 | 636 | 243 |
| All | 1,759 | 205 | 1,552 | 232 |

Comp-U-Med generally followed a practice of sequential placement of the terminals, i.e., in the order in which the

| Year ended | Number of systems sold to investors during period | Cumulative number of systems sold at end of period | Number of systems placed with physicians during period[1] | Cumulative number of physicians at end of period | Total ECG's administered during period | Average (annualized) ECG's per terminal sold (cumulative) | Average (annualized) ECG's per terminal placed |
|---|---|---|---|---|---|---|---|
| 9/30/79 | 80 | 82 | 61 | 67 | 11,000 | 134 | 164 |
| 9/30/80 | 345 | 427 | 170 | 231 | 52,000 | 122 | 225 |
| 9/30/81 | 1,586 | 2,013 | 587 | 818 | 191,000 | 95 | 234 |
| Quarter ended | | | | | | | |
| 12/31/80 | 850 | 1,277 | 92 | 323 | 28,000 | 88 | 347 |
| 12/31/81 | 1,444 | 3,457 | 264 | 1,082 | 85,000 | 98 | 314 |

[1]Net placements during period, equaling total units placed minus total units returned.

terminals were sold to investors. Based on such sequential placement and based on total placements as of November 22, 1982, it would have taken Comp-U-Med approximately another 28 months, or until around March of 1984, to place all of the terminals which had already been sold as of December 31, 1981. As of March 1983, approximately 45 percent of the terminals Comp-U-Med had sold to franchisees had not yet been placed with a user.

To pay the promissory note according to its terms, including the 7-year extension period, a Comp-U-Med ECG terminal purchased and placed pursuant to its franchise program would have to reach an average use of at least 520 ECG's per year. See appendix, tables 1 and 2. Even to meet the $1,500 minimum annual payments, denominated as "interest," a terminal would have to average at least 215 ECG's per year for 14 years. See appendix, tables 3 and 4. For petitioners' terminals placed with Alcoa and General Foods at more favorable terms than Comp-U-Med's suggested rental rates, the required average usage rates are higher, as follows:

*Average ECG's per year to:*

| User | Make full payoff in year | Meet minimum 14 payments |
|------|--------------------------|--------------------------|
| General Foods | 810 | 336 |
| Alcoa | 800 | 336 |

See appendix, tables 5 through 7.

As of March 1982, approximately 60 percent of Comp-U-Med franchisees whose terminals had been placed with users in excess of 1 year were experiencing negative cash flows (apart from the claimed tax benefits). Comp-U-Med was concerned about the slow placements and low usage because its own long-term success depended upon the placement of the terminals with physicians and the level of ECG usage. A successful placement rate was necessary to enable Comp-U-Med to continue to market its terminals/franchises to investors. Also Comp-U-Med recognized that if its marketing method became impracticable because of changes in the tax laws or otherwise, its ability to place its terminals with physicians and thus directly derive revenues from their use would become even more important to the company's economic well-being.

The Comp-U-Med System 107 Computer ECG Terminal is designed for use principally by primary health care providers, generally individual doctors who do not specialize in cardiology. Comp-U-Med has directed its marketing efforts at primary care physicians, industrial clinics, and nursing homes. Comp-U-Med's principal market is generally physicians who perform low volumes of ECG's.

On its books, Comp-U-Med treats the $25,000 promissory note executed by each franchisee as a contingent liability. On its balance sheets, Comp-U-Med records the notes as long-term notes receivable, assigning as their value the discounted present value of the minimum annual payments of $1,500 for 7 years plus the $1,000 to convert the note to nonrecourse. Moreover, Comp-U-Med records accrued revenues upon a sale of a franchise in an amount equal to the cash downpayment received plus the present value of the future payments to which it is unconditionally entitled (i.e., the minimum annual payments and the conversion payment).

Comp-U-Med uses and applies the $3,000 first year prepayment, denominated as a "royalty fee," received from the sale of each Comp-U-Med franchise as follows:

| | |
|---|---:|
| $0.50 per ECG Equivalent, based on expected use of 400 ECG's | $200 |
| Placement commission | 700 |
| Consulting (medical, engineering, and marketing) | 400 |
| Advertising of terminals to medical community | 200 |
| Additional marketing incentives to distributors | 200 |
| Training medical user's staff in use of terminal | 100 |
| Installation of equipment on user's facilities | 100 |
| Product liability insurance, franchisee named insured | 200 |
| All risk equipment insurance covering equipment loss and injury/damage caused by equipment | 200 |
| First year warranty repairs | 300 |
| Profit | 400 |
| Total | 3,000 |

Comp-U-Med broke down the elements of its stated purchase price of $27,500 for a terminal as follows:

| | |
|---|---:|
| Manufacturing costs (materials, labor, and overhead) | $3,000 |
| Sales commission and overrides (direct commissions to independent distributors and "override" commissions to Comp-U-Med's supervisors) | 1,750 |
| Other billing costs[1] | 500 |

```
5-year warranty (factory service warranty to franchi-
    sees and on-site service to users)..................$1,000
Amortization of development costs (development of
    Model 107 ECG Terminal).......................   500
Software ........................................   500
Amortization of central computer (lease on Hewlett
    Packard mainframes)...........................  1,000
Central software for mainframe....................   500
Profit .........................................18,750[2]
Total...........................................27,500
```

[1]This appears to represent Comp-U-Med's costs of billing users in excess of the fees provided for in the franchise agreement.

[2]The exhibit from which this data was taken reports profit at only $17,250; this figure, when added to the others, totals only $26,000, $1,500 less than Comp-U-Med's stated purchase price. Since there do not appear to be any other costs, we have treated this $1,500 discrepancy as a mathematical error and accordingly treated it as part of Comp-U-Med's "profit."

When Comp-U-Med introduced its System 107 Computer ECG Terminal in 1978, there were already several companies competing in the market for computerized ECG's. There were approximately 11 other companies that manufactured automatic electrocardiograph terminals that took an electrocardiogram from a patient and transmitted it over a phone line to a computer center. There were approximately six companies that sold integrated computer systems with hardware and software to hospitals and to service bureau companies selling computer time. Many companies sold computers and computer programs; there were also approximately 12 service bureau companies. Companies like Hewlett-Packard (and shortly thereafter, IBM[12]), which had been among the first to use and improve the U.S. Public Health Service program, attempted to sell ECG terminals and mainframe computers to large hospitals processing large numbers of ECG's. Smaller companies, like Phone-A-Gram and Telemed, manufactured simpler, less sophisticated terminals for use in connection with their central data bases for processing ECG's; these companies concentrated on lower volume users such as small hospitals, clinics, corporate and industrial health units, and individual physicians. Other prominent companies in the field of computer-

[12]At the time Comp-U-Med entered the market, IBM was marketing the most prominent computer program for ECG interpretation. IBM also produced and marketed ECG terminals, concentrating, like Hewlett-Packard, on high volume users.

interpreted ECG's included American Optical, Burdick, Cambridge, and Marquette. Phone-A-Gram and Telemed were most comparable to Comp-U-Med and were its primary competitors.

There were some differences among the various ECG terminals and computer analysis systems offered in the market. The simplest terminal was a device that merely transmitted the electrical data provided by a basic electro-cardiograph to a computer for analysis. Such a device might or might not have a strip chart to give the administering physician or technician an immediate reading. A more advanced terminal would also have the capability to receive and print out the computer's interpretation of the ECG; these terminals would also usually have a strip chart, so that the reading and computer interpretation could be maintained together. The most sophisticated system would have its own internal computer for interpreting the ECG so that no data transmission to or receipt from a separate computer (teleprocessing) center would be required.

All of the terminals, however simple or sophisticated, required "patient cables," the electric cables that convey the electrical data to the terminals. These cables had to be replaced after approximately 5,000 ECG's. To attach the patient to the electrode at the end of the cables also required use of suction cups for each of the electrodes and a special gel on each suction cup to improve electrical conductivity. Those terminals with strip charts and printers also had to have strip-chart paper.

There were other technical differences among the various terminals. First, there were differences in the method of transmitting the ECG data. Most of the equipment had 12 leads receiving electrical data from the patient, but some equipment transmitted or received information in three channels and some in one channel. Each lead or group of leads transmitted so many seconds of data, so a single-channel system required more time than a three-channel system to send and to receive. Similarly, strip charts incorporated in terminals could print one or three channels of data; single-channel strip charts were more common, even in terminals transmitting three channels of data. Because more data was transmitted at once, three-channel terminals

transmitted the data faster than single-channel terminals, but single-channel terminals actually transmitted more data as to the heart's rhythms over a longer period of time. The interpretation of an ECG, computerized or manual, essentially required a three-channel presentation; with single-channel strip charts, this essentially required cutting the information into three strips and mounting them to show the three strips together. The three-channel presentation gave the cardiologist a look at a single complex from three different views at the same time. Thus, a cardiologist could look at an abnormal beat from three different directions, and for that reason some cardiologists favored the three-channel system. However, the disadvantage was that there was only 10 seconds of data available for analysis. With the older machines with single-channel transmission, it took a longer period to perform the ECG, but the ECG resulted in more data and more total length of time in which the cardiologist could detect abnormal rhythms in the heart.

The ECG data was encoded for transmission in two different modes—digital and analog. Much of the reason for the different transmission modes related to the sophistication of the telephone equipment. Analog transmission was a little slower than digital because it would have to be converted into digital for use by the computer; presumably, the computer's interpretation would also have to be reconverted for transmission back to an analog terminal. While the matter is not wholly free of doubt, digital transmission may be somewhat more reliable than analog and may represent some slight improvement over analog machines.

Of the terminals capable of receiving back the computer interpretation, some received it on the same telephone call. These terminals, acoustically coupled or using standard telephone jacks, were portable. Other terminals required a separate call-back from the computer facility; because these terminals required "hard wiring" and a dedicated telephone line for the computer callback, these terminals were not portable.

All but the most sophisticated of the computerized ECG systems required access to a central mainframe computer for analysis of the ECG's. High volume users, primarily hospitals, could afford to acquire their own mainframes or

sophisticated systems containing their own internal computers. Lower volume users who could not afford their own mainframes were required instead to use private service bureaus offering central mainframes for multiple users. The compatibility of a particular terminal and mainframe (whether owned or accessed through a service bureau) depends upon the software (programming) used in the mainframe.[13] Comp-U-Med maintains a central service bureau using Hewlett-Packard HP-1000 mainframe computers to which its franchisees (and their users) have an unlimited right of access under the franchise agreements.

Comp-U-Med's System 107 Computer ECG Terminal (terminal) is a three-channel ECG terminal containing a single-channel writer (strip chart) and a printer. The terminal must be connected to a telephone line for transmission of the patient information to a computer processing center and for receipt of the analysis from the computer center. The terminal, however, is fully portable, plugging into any standard telephone jack. The terminal has a key pad for entering patient identifying and diagnostic data. After a technician taking the ECG enters the patient data, the terminal automatically dials and transmits the data and the ECG readings via telephone lines to the computer center.[14] On the same telephone call, the interpretation is transmitted to the terminal, which produces the ECG traces in a strip graph and a printout of the computerized analysis, which are then mounted by the technician on a form provided by Comp-U-Med. Comp-U-Med offered (at additional cost to users) review by a cardiologist of the computerized ECG interpretation (cardiologist overreading), both immediate and delayed.

Initially, Comp-U-Med manufactured terminals that used the analog mode of transmission but switched in 1981 to digital. All four of petitioners' terminals are analog. Comp-U-Med included a 5-year factory service or replacement warranty for its terminals. It appears that Comp-U-Med

---

[13]For example, the service bureau at Providence Hospital in Seattle, using Hewlett-Packard Model HP-1000 mainframes, provided interpretation services to users with terminals made by Hewlett-Packard, Comp-U-Med, and Marquette.

[14]Although the terminal is initially programmed to telephone Comp-U-Med's computer center in Los Angeles, this would appear to be reprogrammable, since some Comp-U-Med terminals have access to the computer center at Providence Hospital in Seattle, Washington.

provided the patient cables and suction cups at no cost. Comp-U-Med also sold the electrodes, gel, and paper necessary to use the terminal.

The Telemed SR-200 ECG terminal is similar to Comp-U-Med's Model 107. The Telemed SR-200 transmits three channels of ECG data to a central computer; it has a single-channel strip chart writer. Like the Comp-U-Med Model 107, the SR-200 has a key pad for entry of the patient data, which is transmitted along with the ECG data directly to Telemed's computer service bureau. Unlike Comp-U-Med's terminals, the SR-200 receives the computer interpretation by a separate telephone call rather than on line; consequently, the SR-200 must be hard wired to a telephone line and is not portable.

Telemed's primary market was individual physicians and small hospitals (200 beds or less); in 1978, its customers averaged about 1,000 ECG's per year. Telemed tried to secure long-term leases for its terminals, up to 5 years. In 1983, Telemed sold its SR-200 ECG terminal for approximately $4,750, which was complete (terminal, strip chart graph, and printer) except for the stand. The record contains no information regarding any warranties, service policies, patient cables, or the related supplies for Telemed's SR-200.

Phone-A-Gram, Comp-U-Med's other primary competitor in the lower volume user market, manufactured various relatively simple ECG terminals. Its basic unit was a terminal that transmitted the ECG data to Phone-A-Gram's central computer. The basic unit had no strip chart and no printer. Phone-A-Gram also offered a unit with a strip chart. Beginning in 1980, Phone-A-Gram also offered a remote printer (separate from the terminal), initially an off-the-shelf model manufactured by another company and subsequently a printer it manufactured itself.

All of Phone-A-Gram's ECG units used a single-channel ECG transmission. Compared to Comp-U-Med's 20-second data epoch, Phone-A-Gram's data epoch was 72 seconds, which can be important in the rhythm analysis of an ECG. Phone-A-Gram's units were acoustically coupled to the telephone lines, allowing greater portability. There was no automatic access to the Phone-A-Gram computers; instead,

an operator would orally take the patient data from the physician or ECG technician and enter it into the Phone-A-Gram computer and then direct that the ECG trace be commenced. The operator could observe the quality of the ECG trace and, if it was not good, direct that another trace be sent. Phone-A-Gram's usual practice was to mail back a report and strip chart of the tracing. Those customers with optional printers could receive back the computer interpretation. Phone-A-Gram also provided (at additional cost) for oral callback of reports, with or without separate review by a Phone-A-Gram staff cardiologist,[15] similar to that offered by Comp-U-Med.

Phone-A-Gram's principal market was lower volume users, primarily individual physicians. Phone-A-Gram also targeted small clinics, corporate and governmental health units, and small hospitals. From the late 1970's through 1982, Phone-A-Gram's users averaged approximately 150 to 200 ECG's per year. Phone-A-Gram sold few of its ECG units directly to users, preferring to place them with rental users on a fee-for-use basis. Like Comp-U-Med, Phone-A-Gram's minimum monthly rentals entitled the users to a certain number of ECG interpretations. Phone-A-Gram's rates were comparable to those suggested by Comp-U-Med. Most sales of Phone-A-Gram units were sale-and-leasebacks for financing purposes, primarily with its shareholders and other related persons. Phone-A-Gram did offer its units for sale to users. In 1980, its basic unit without a printer sold for about $2,000, and in 1983 its strip chart unit with a remote printer sold for about $3,400. Its prices reflected a markup of about 50 percent over its manufacturing costs. Sales included a 1-year warranty; rental users were entitled to full maintenance (repair or replace) for as long as they remained users. To rental users, Phone-A-Gram supplied the patient cables and initial supplies (electrodes, contact gel, and strip chart paper); additional supplies it sold to its users. The record does not indicate the terms upon which user-purchasers of a Phone-A-Gram unit obtained patient cables and related supplies. Phone-A-Gram maintained a bank of central computers for analyzing ECG's to which its users had access; like Comp-U-Med, Phone-A-Gram maintained a

---

[15]Cardiologist overreading was also available on an emergency ("stat") basis.

WATS telephone line for its long-distance customers, for which it charged them.

Hewlett-Packard manufactured and sold terminals for computer ECG interpretation as well as the mainframe computers. Hewlett-Packard concentrated its sales efforts on large hospitals and similar high volume users processing 5,000 or more ECG's per year. In 1980, Hewlett-Packard sold its Model 1517A ECG Terminal. The Model 1517A was a three-channel transmission unit with a single-channel strip chart. The Model 1517A included (at extra cost), a transmitter to send the ECG data to a computer and a printer to print out the interpretation. In 1980, a Model 1517A that included a transmitter and printer sold for about $14,500.

In 1981, Hewlett-Packard discontinued the Model 1517A, replacing it with the Model 4700A. Like the 1517A, the 4700A was a three-channel unit; its strip chart, though, produced a three-channel report on an 8½ inch by 11 inch sheet by a special device that involved new technology. In 1983, a Hewlett-Packard 4700A, including transmitter and printer, sold for about $12,000.

Both the 1517A and 4700A included a 1-year warranty upon sale. Hewlett-Packard offered a service contract for the terminals, calling for on-site servicing. In 1980, the cost was about $106 per month; in 1983, it was about $166 a month, but in both years the cost could have been more depending on the customer's geographical location. Hewlett-Packard also offered a less expensive service contract for maintenance at its service centers rather than on site. Hewlett-Packard also sold patient cables and at least some of the related supplies.

Hewlett-Packard sold its terminals directly to users; any leasing was arranged by the purchasers, not by Hewlett-Packard. There was an active market for used Hewlett-Packard terminals; prices depended on the age and condition of the particular terminal, but generally ranged between 50 and 70 percent of the initial (new) selling price. Because Hewlett-Packard was a leader in the industry, it could (and did) charge higher prices for its terminals, supplies, and services.

IBM introduced its Model 5880 ECG System in 1979. Unlike the other ECG terminals discussed above, the IBM

5880 contained its own internal microcomputer, eliminating the need for a central mainframe computer system. This unit was a three-channel terminal with an integrated printer and three-channel strip chart. The 5880 could store up to 21 ECG's, or up to 70 with an optional second disk unit. In 1980, an IBM 5880 cost about $35,600—$21,600 for the unit and a one-time licensing fee of $14,000 for IBM's software (including updates). The IBM service contract was about $105 per month in 1980. By 1983, the IBM 5880 sold for about $14,500—$10,000 for the terminal and a $4,500 fee for the software. By 1983, the service contract was $150 a month.

In 1981, IBM introduced its Model 5885 Terminal featuring a three-channel mode with a single-channel printout. The IBM 5885 had to be used with a remote computer, either an IBM 5880 system or a central mainframe computer. IBM does not have a central computer processing bureau for ECG analysis. The IBM 5885, equipped with a transmitter for teleprocessing, sold for $17,600 both in 1981 and in 1983. The service contract for the IBM 5885 was about $157 per month.

Like Hewlett-Packard, IBM's primary market was large hospitals and similar high volume users. IBM's high prices effectively excluded it from competing in the lower volume user market. Only a small percentage of IBM's Model 5880 and Model 5885 units was sold to individual physicians.

On Schedule C of their 1980 joint individual income tax return, petitioners reported gross receipts, deductions, and losses from their Comp-U-Med franchise equipment leasing venture as follows:

| | | |
|---|---:|---:|
| Gross income | | 0 |
| Deductions: | | |
| Depreciation | $19,143 | |
| Legal and professional | 3,000 | |
| Royalty fees | 12,000 | |
| Total deductions | | $34,143 |
| Net loss | | (34,143) |

The depreciation deduction was based on a cost basis for the four terminals of $110,000, using double declining balance depreciation and a useful life of 7 years. Petitioners elected the Class Life Asset Depreciation Range (CLADR)

System of depreciation and the half-year convention. Petitioners claimed $4,000 additional first-year depreciation plus $15,143 of depreciation using the double declining balance method. In addition, petitioners claimed a tentative regular investment credit for the terminals of $11,000. The deduction for legal and professional fees represents the management fee of $750 per franchise that petitioners paid to MMG. The deduction for royalty fees represents the payment of $3,000 per franchise denominated as first-year royalty fees. Petitioners' 1980 taxable income, excluding all items relating to Comp-U-Med, was $34,038.

In his statutory notice of deficiency, respondent allowed the entire claimed deduction of $3,000 for legal and professional fees (the management fee, $750 per franchise, that petitioners paid to MMG). Respondent also allowed $2,400 ($600 per franchise) of the royalty fee as the maximum potential royalty based on Comp-U-Med's highest projected use (1200 ECG's per year at $0.50 royalty per ECG). Respondent disallowed the remaining $9,600 of $12,000 first-year "royalty" fee ($2,400 per franchise) as nondeductible startup costs. Respondent determined that no depreciation or amortization of these "capitalized" startup costs was allowable. With respect to petitioners' claimed depreciation and investment credit, respondent made alternative determinations. Respondent's primary position is that neither depreciation nor investment credit is allowable because petitioners did not place their terminals in service during 1980, the taxable year in issue. Alternatively, respondent determined that petitioners' purchase money indebtedness for their terminals was effectively nonrecourse and too contingent and speculative to be a true debt for Federal tax purposes. Accordingly, respondent limited petitioners' basis for depreciation and the investment credit to $10,000, the cash downpayment of $2,500 per terminal. Because he determined the note was effectively nonrecourse, respondent also concluded that petitioners' "investment" in the terminals attributable to the note was not at risk, within the meaning of section 465. Finally, respondent determined that petitioners had not shown that their untimely return was due to reasonable cause and accordingly determined the section 6651(a) delinquency addition to

tax. Although the statutory notice determined the addition to be the maximum of 25 percent of the tax, respondent now concedes that this is a mathematical error and that since their return was less than 1 month late, petitioners are liable for an addition of only 5 percent of the tax. See sec. 6651(a)(1), (b)(1).

*Appendix to Findings of Fact*

Neither party presented any probative expert valuation testimony or reports. Petitioners offered an appraisal report Comp-U-Med had obtained; the Court excluded it since the appraiser had died before the trial and the appraisal report was not admissible as a business record under Federal Rules of Evidence 803(6), as petitioners contended. Petitioners' expert, Dr. James M. Stancill, accepted the purchase price stated by Comp-U-Med as the fair market value and simply addressed what he regarded as the economics of the investment. The Court struck both the testimony and the reports of respondent's expert for reasons set out in the Court's order of August 31, 1983, which is here incorporated by reference. See note 16, *infra*. However, respondent's expert merely purported to show errors in Dr. Stancill's report and did not address any valuation issues. Most of the materials respondent's expert relied upon and discussed were already matters of record. There is, without expert valuation reports, ample evidence in the record to support the Court's determination of fair market value. As to petitioners' expert, the Court relied upon his testimony, with modifications, for the economics of the proposed investment as viewed by petitioners in entering into the investment, and hence to show petitioners had an actual and honest profit objective, although not a reasonable one.

The tables on pages 880-884 project income and expense from the operation of a Comp-U-Med ECG terminal and franchise to determine the usage levels necessary for minimum payment and for full payment of the purchase money "indebtedness." Our methodology in making these projections is based on that of petitioners' expert witness, Dr. James M. Stancill, with various modifications.[16]

---

[16]We are not bound to accept Dr. Stancill's expert testimony as gospel. "The Tax Court does not have to accept 'in toto, in part' or at all expert opinion as to value." *Palmer v. Commissioner*, 523 F. 2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974). See also *Helvering v. National Grocery Co.*, 304 U.S. 282, 294 (1938); *Silverman v. Commissioner*, 538

Each table will identify its various individual assumptions that depart in any way from our general assumptions.

*General Assumptions*:

1. Revenues are based on the per-ECG rates suggested by Comp-U-Med in its offering circular.

2. The royalties, billing fees, and placement commissions are those called for in Comp-U-Med's offering circular.[17]

3. We have excluded the first-year advance payment of $3,000, denominated as a "royalty." This item was prepaid, and, consequently, does not affect the allocation of a franchisee's first-year net revenues, if any.

4. Dr. Stancill's projections did not include any expense for maintenance. Our projection also includes none for the first 5 years, while the terminal is under warranty. We believe, however, that a maintenance expense should be included for subsequent years. The Hewlett-Packard and IBM service contracts, available for the duration of the use of those terminals, suggest that maintenance expenses are a regular cost that should be included in the projection and

---

F. 2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Our obligation as fact finder is to exercise our best judgment based on all of the evidence of record. In some instances, we have not accepted Dr. Stancill's underlying assumptions because we do not think them to be in accord with the realities of these transactions as shown by the evidentiary record as a whole.

At times during and after the trial, we have expressed dissatisfaction with the state of the evidentiary record in this test case, having perceived what seemed to be on occasion perhaps an excess of zeal on the part of counsel for both parties. With their customary zealous advocacy, counsel for both parties on brief renewed their respective objections to the Court's various evidentiary rulings. We have reviewed all of our rulings, both those excluding and those admitting certain proffered documents or testimony over the vigorous objection of counsel for one party or the other. We are satisfied with our rulings and decline the invitation of each party to reverse those rulings with which that particular party is unhappy. Both parties had a full and fair opportunity to develop all of the facts necessary to present their respective positions on the various issues in this test case. After careful study and consideration of the evidentiary record as it now stands, we are satisfied this record is wholly adequate for this test case. We applaud vigorous advocacy, and conclude that if excessive zeal inflicted any injury, it was injury only to the fact finder's ease of working with the voluminous, disorganized record, but not to the adequacy of the record for that purpose.

[17]Dr. Stancill's projections failed to take into account the full commission each of the distribution agreements gave the distributors, namely the first and last month's minimum fee in addition to 10 percent of the gross revenues. Since the contemplated user arrangements called for a minimum fee of about $100 per month, we have included $200 in the year of placement as additional distributor commission. Moreover, we read the distribution agreements to call for this additional commission each time the terminal is placed with a new user. Although Comp-U-Med claims an annual turnover (return) rate of only about 12 percent, the industry figure is in the 20- to 25-percent range; accordingly, we have assumed a return rate of 20 percent, meaning that each terminal is returned and placed with a new user, on average, every 5 years. Our projections, consequently, also include this additional commission every fifth year.

## TABLE 1

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fees per ECG | $7.00 | $7.70 | $8.47 | $9.32 | $10.25 | $11.27 | $12.40 | $13.64 | $15.01 | $16.51 | $18.16 | $19.97 | $21.97 | $24.17 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.35 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECG's per year | 0 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 |
| Gross revenues | $0 | $4,004 | $4,404 | $4,846 | $5,330 | $5,860 | $6,448 | $7,093 | $7,805 | $8,585 | $9,443 | $10,384 | $11,424 | $12,568 |
| **Expenses:** | | | | | | | | | | | | | | |
| Royalty | 0 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |
| Billing fee | 0 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| WATS fee | 0 | 572 | 629 | 692 | 759 | 837 | 920 | 1,014 | 1,113 | 1,227 | 1,347 | 1,487 | 1,633 | 1,794 |
| Distributor & commission | 0 | 400 | 440 | 485 | 533 | 586 | 645 | 709 | 761 | 859 | 944 | 1,0938 | 1,142 | 1,257 |
| Add'l distributor commission | 0 | 220 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Interest | $1,500 | 1,500 | 1,471 | 1,425 | 1,369 | 1,299 | 1,225 | 1,147 | 1,042 | 919 | 776 | 611 | 438 | 221 |
| Total expenses | 1,500 | 3,038 | 2,886 | 2,948 | 3,007 | 3,390 | 3,844 | 3,606 | 3,711 | 3,823 | 3,932 | 4,619 | 4,187 | 4,308 |
| Net revenues | (1,500) | 966 | 1,518 | 1,898 | 2,323 | 2,470 | 2,604 | 3,487 | 4,094 | 4,762 | 5,511 | 6,765 | 7,237 | 8,260 |
| Payment to principal | (1,500) | 483 | 759 | 949 | 1,162 | 1,235 | 1,302 | 1,743 | 2,047 | 2,381 | 2,756 | 2,882 | 3,619 | 3,682 |
| Principal balance | 25,000 | 24,517 | 23,758 | 22,809 | 21,647 | 20,412 | 19,110 | 17,367 | 15,320 | 12,939 | 10,183 | 7,301 | 3,682 | 0 |

ASSUMPTIONS: Payoff in year 14
12-month delay in placement
10% inflation
Income and expense projections rounded to even dollars

## TABLE 2

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ECGs per year | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| Gross revenues | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 | $7,200 |
| **Expenses:** | | | | | | | | | | | | | | |
| Royalty | 0 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Billing fee | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 |
| WATS fee | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| Distributor & commission | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 |
| Add'l distributor commission | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Interest | 1,500 | 1,395 | 1,301 | 1,203 | 1,103 | 999 | 904 | 801 | 694 | 584 | 471 | 360 | 240 | 116 |
| Total expenses | 3,740 | 4,035 | 3,941 | 3,843 | 3,743 | 4,039 | 3,744 | 3,641 | 3,534 | 3,424 | 3,511 | 3,200 | 3,080 | 2,956 |
| Net revenues | 3,460 | 3,164 | 3,259 | 3,357 | 3,457 | 3,161 | 3,456 | 3,559 | 3,666 | 3,776 | 3,689 | 4,000 | 4,120 | 4,244 |
| Payment to principal | 1,780 | 1,582 | 1,630 | 1,678 | 1,729 | 1,580 | 1,728 | 1,780 | 1,833 | 1,888 | 1,844 | 2,000 | 2,060 | 1,938 |
| Principal balance | 23,270 | 21,688 | 20,058 | 18,380 | 16,651 | 15,071 | 13,343 | 11,563 | 9,730 | 7,842 | 5,998 | 3,998 | 1,938 | 0 |

Average ECGs per year: 1,200
ASSUMPTIONS: Payoff in year 14
No inflation
Placement in year 1
ECG fee - $7.00 each, first 600
$5.00 each, next 600
WATS fee - $1.00 per ECG
Income and expense projections are rounded to even dollars
No first-year use royalty, as per franchise agreement

## TABLE 3

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG | $7.00 | $7.70 | $8.47 | $9.32 | $10.25 | $11.27 | $12.40 | $13.64 | $15.01 | $16.51 | $18.16 | $19.97 | $21.97 | $24.17 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECGs per year | 336 | 296 | 267 | 240 | 217 | 277 | 217 | 200 | 186 | 170 | 197 | 147 | 186 | 127 |
| Gross revenues | $2,352.00 | $2,279.20 | $2,261.49 | $2,236.80 | $2,224.25 | $3,121.79 | $2,690.80 | $2,728.00 | $2,761.94 | $2,806.70 | $3,577.52 | $2,935.59 | $2,987.92 | $3,065.59 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 145.00 | 133.50 | 120.00 | 108.50 | 138.50 | 108.50 | 100.00 | 92.00 | 85.00 | 98.50 | 73.50 | 68.00 | 63.50 |
| Billing Fee | 76.80 | 74.80 | 73.35 | 72.00 | 70.85 | 73.85 | 70.85 | 70.00 | 69.20 | 68.50 | 69.85 | 67.35 | 66.80 | 66.35 |
| WATS Fee | 336.00 | 325.60 | 323.07 | 319.20 | 316.82 | 445.97 | 384.09 | 390.00 | 393.76 | 401.20 | 510.23 | 418.95 | 427.04 | 438.15 |
| Distributor & commission | 235.20 | 227.92 | 226.15 | 223.68 | 222.43 | 312.18 | 269.08 | 272.80 | 276.18 | 280.67 | 357.75 | 293.56 | 298.79 | 306.96 |
| Additional distributor commission | 200.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322.10 | 322.10 | 389.74 | 428.72 | 471.59 | 518.75 | 570.62 | 627.68 | 690.45 |
| Interest | 1,500.00 | 1,499.88 | 1,499.79 | 1,499.62 | 1,499.55 | 1,499.37 | 1,499.14 | 1,498.99 | 1,498.70 | 1,498.55 | 1,498.50 | 1,498.27 | 1,497.67 | 1,497.58 |
| Total Expenses | 2,348.00 | 2,276.20 | 2,255.36 | 2,234.50 | 2,218.15 | 3,114.07 | 2,685.97 | 2,721.53 | 2,758.56 | 2,805.51 | 3,572.33 | 2,922.25 | 2,985.98 | 3,062.59 |
| Net revenues | 4.00 | 3 | 5.63 | 2.30 | 6.10 | 7.72 | 4.83 | 6.47 | 3.28 | 5.19 | 5.19 | 13.36 | 1.94 | 6.60 |
| Payment to principal | 2.00 | 1.50 | 2.82 | 1.15 | 3.05 | 3.36 | 2.41 | 4.85 | 2.46 | .89 | 3.89 | 10.02 | 1.45 | 4.95 |
| Principal balance | 24,998.00 | 24,996.50 | 24,993.68 | 24,992.53 | 24,989.48 | 24,985.62 | 24,983.21 | 24,978.36 | 24,975.90 | 24,975.01 | 24,971.12 | 24,961.10 | 24,959.85 | 24,954.70 |

ASSUMPTIONS: Average ECGs per year: 215
Meet minimum annual payment
10% inflation
No first-year use royalty, as per franchise agreement

## TABLE 4

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ECGs per year | 336 | 329 | 329 | 329 | 329 | 413 | 371 | 371 | 371 | 371 | 413 | 371 | 371 | 371 |
| Gross revenues | $2,352.00 | $2,303.00 | $2,303.00 | $2,303.00 | $2,303.00 | $2,891.00 | $2,597.00 | $2,597.00 | $2,597.00 | $2,597.00 | $2,891.00 | $2,597.00 | $2,597.00 | $2,597.00 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 164.50 | 164.50 | 164.50 | 164.50 | 206.50 | 185.50 | 185.50 | 185.50 | 185.50 | 206.50 | 185.50 | 185.50 | 185.50 |
| Billing fee | 76.80 | 76.45 | 76.45 | 76.45 | 76.45 | 80.65 | 78.55 | 78.55 | 78.55 | 78.55 | 80.65 | 78.55 | 78.55 | 78.55 |
| WATS fee | 336.00 | 329.00 | 329.00 | 329.00 | 329.00 | 413.00 | 371.00 | 371.00 | 371.00 | 371.00 | 413.00 | 371.00 | 371.00 | 371.00 |
| Distributor & commission | 235.20 | 230.30 | 230.30 | 230.30 | 230.30 | 289.10 | 259.70 | 259.70 | 259.70 | 259.70 | 289.10 | 259.70 | 259.70 | 259.70 |
| Additional distributor commission | 200.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| Interest | 1,500.00 | 1,499.88 | 1,499.79 | 1,499.70 | 1,499.61 | 1,499.52 | 1,499.45 | 1,499.37 | 1,499.24 | 1,499.10 | 1,498.96 | 1,498.84 | 1,498.68 | 1,498.52 |
| Total expenses | 2,348.00 | 2,300.13 | 2,300.04 | 2,299.95 | 2,299.86 | 2,888.77 | 2,594.20 | 2,594.12 | 2,593.99 | 2,593.85 | 2,888.21 | 2,593.59 | 2,593.43 | 2,593.27 |
| Net revenues | 4.00 | 2.87 | 2.96 | 3.05 | 3.14 | 2.23 | 2.80 | 2.88 | 3.01 | 3.15 | 2.79 | 3.41 | 3.67 | 3.73 |
| Payment to principal | 2.00 | 1.44 | 1.48 | 1.52 | 1.57 | 1.12 | 1.40 | 2.16 | 2.28 | 2.36 | 2.09 | 2.56 | 2.75 | 2.80 |
| Principal balance | 24,998.00 | 24,996.56 | 24,995.08 | 24,993.56 | 24,991.99 | 24,990.87 | 24,989.47 | 24,987.31 | 24,985.05 | 24,982.69 | 24,980.60 | 24,978.04 | 24,975.29 | 24,972.49 |

ASSUMPTIONS: Average ECGs per year: 362.5
Meet minimum annual payments
No inflation
ECG Fee - $7.00 each
WATS Fee - $1.00 per ECG
No first-year use royalty, as per franchise agreement

TABLE 5

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG  First 780 | $5.00 | $5.50 | $6.05 | $6.66 | $7.32 | $8.05 | $8.86 | $9.74 | $10.72 | $11.79 | $12.97 | $14.27 | $15.69 | $17.28 |
|                    781+ | $4.00 | $4.40 | $4.84 | $5.32 | $5.85 | $6.44 | $7.09 | $7.79 | $8.57 | $9.43 | $10.37 | $11.41 | $12.55 | $13.81 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECUs per year | 0 | 810 | 810 | 810 | 810 | 810 | 810 | 810 | 810 | 810 | 810 | 810 | 810 | 810 |
| Gross revenues | 0 | $4,422 | $4,864 | $5,354 | $5,885 | $6,472 | $7,124 | $7,831 | $8,619 | $9,479 | $10,428 | $11,473 | $12,615 | $13,877 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 | 405 |
| Billing fee | 0 | 100 | 100 | 101 | 100 | 101 | 100 | 101 | 100 | 101 | 100 | 101 | 100 | 101 |
| WATS fee | 0 | 891 | 980 | 1,077 | 1,188 | 1,304 | 1,434 | 1,580 | 1,733 | 1,912 | 2,098 | 2,309 | 2,543 | 2,795 |
| Distributor & commission | 0 | 442 | 486 | 535 | 589 | 647 | 712 | 783 | 862 | 948 | 1,043 | 1,147 | 1,262 | 1,388 |
| Additional distributor commission | 0 | 220 | 0 | 0 | 0 | 0 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Interest | $1,500 | 1,500 | 1,474 | 1,432 | 1,377 | 1,320 | 1,259 | 1,163 | 1,061 | 940 | 799 | 635 | 463 | 247 |
| Total expenses | 1,500 | 3,559 | 3,445 | 3,550 | 3,654 | 4,089 | 4,335 | 4,422 | 4,590 | 4,778 | 4,964 | 5,739 | 5,401 | 5,626 |
| Net revenues | (1,500) | 863 | 1,419 | 1,804 | 2,231 | 2,383 | 2,789 | 3,409 | 4,029 | 4,701 | 5,464 | 5,734 | 7,214 | 8,251 |
| Payment to principal | (1,500) | 432 | 709 | 902 | 1,116 | 1,191 | 1,393 | 1,705 | 2,014 | 2,351 | 2,732 | 2,867 | 3,607 | 4,111 |
| Principal balance | 25,000 | 24,588 | 23,859 | 22,957 | 21,841 | 20,650 | 19,387 | 17,682 | 15,668 | 13,317 | 10,585 | 7,718 | 4,111 | 0 |

ASSUMPTIONS: General Foods user contract—$5.00 per ECG for first 65 ECG/month (780 per year, $4.00 per ECG thereafter (in first year)
10% inflation
12-month placement delay
Payoff in year 14
Income and expense projections are rounded to even dollars

TABLE 6

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG | $5.00 | $5.50 | $6.05 | $6.66 | $7.32 | $8.05 | $8.86 | $9.74 | $10.72 | $11.79 | $12.97 | $14.27 | $15.69 | $17.26 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECUs per year | 0 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 |
| Gross revenues | 0 | $4,400 | $4,840 | $5,328 | $5,856 | $6,440 | $7,088 | $7,792 | $8,576 | $9,432 | $10,376 | $11,416 | $12,552 | $13,808 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Billing fee | 0 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| WATS fee | 0 | 880 | 968 | 1,064 | 1,168 | 1,288 | 1,416 | 1,560 | 1,712 | 1,888 | 2,072 | 2,280 | 2,512 | 2,760 |
| Distributor & commission | 0 | 440 | 484 | 533 | 586 | 644 | 709 | 779 | 858 | 943 | 1,038 | 1,142 | 1,255 | 1,381 |
| Additional distributor commission | 0 | 220 | 0 | 0 | 0 | 0 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322 | 354 | 390 | 429 | 472 | 519 | 571 | 638 | 690 |
| Interest | $1,500 | 1,500 | 1,474 | 1,432 | 1,378 | 1,311 | 1,240 | 1,164 | 1,062 | 942 | 801 | 638 | 467 | 251 |
| Total expenses | 1,500 | 3,540 | 3,426 | 3,529 | 3,632 | 4,065 | 4,573 | 4,398 | 4,561 | 4,745 | 4,930 | 5,702 | 5,362 | 5,582 |
| Net revenues | (1,500) | 860 | 1,414 | 1,799 | 2,224 | 2,375 | 2,515 | 3,394 | 4,015 | 4,687 | 5,446 | 5,714 | 7,190 | 8,226 |
| Payment to principal | (1,500) | 430 | 707 | 900 | 1,112 | 1,187 | 1,258 | 1,699 | 2,008 | 2,343 | 2,723 | 2,857 | 3,595 | 4,113 |
| Principal balance | 25,000 | 24,570 | 23,863 | 22,963 | 21,851 | 20,664 | 19,406 | 17,707 | 15,699 | 13,356 | 10,633 | 7,776 | 4,181 | 68 |

ASSUMPTIONS: Alcoa user contract, $5.00 per ECG (in first year)
10% inflation
12-month placement delay
Payoff in year 14
Income and expense projections are rounded to even dollars

## TABLE 7

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG | $5.00 | $5.50 | $6.05 | $6.66 | $7.32 | $8.05 | $8.86 | $9.74 | $10.72 | $11.79 | $12.97 | $14.27 | $15.69 | $17.26 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECGs per year | 511 | 473 | 424 | 380 | 341 | 434 | 339 | 312 | 286 | 264 | 305 | 226 | 210 | 196 |
| Gross revenues | $2,555.00 | $2,601.50 | $2,565.20 | $2,530.80 | $2,496.12 | $3,493.70 | $3,003.54 | $3,038.88 | $3,065.92 | $3,112.56 | $3,955.85 | $3,225.02 | $3,294.90 | $3,382.96 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 236.50 | 212.00 | 190.00 | 170.50 | 217.00 | 169.50 | 156.00 | 143.00 | 132.00 | 152.50 | 113.00 | 105.00 | 98.00 |
| Billing fee | 85.55 | 83.65 | 81.20 | 79.00 | 77.05 | 81.70 | 76.95 | 75.80 | 74.30 | 73.20 | 75.25 | 71.30 | 70.50 | 69.30 |
| WATS fee | 511.00 | 520.30 | 513.04 | 505.40 | 497.86 | 698.74 | 600.03 | 608.40 | 612.04 | 623.04 | 789.95 | 644.10 | 659.40 | 676.20 |
| Distributor & commission | 255.50 | 260.15 | 256.52 | 253.08 | 249.61 | 349.37 | 300.35 | 303.89 | 306.59 | 311.26 | 395.59 | 322.50 | 329.49 | 338.30 |
| Additional distributor commission | 200.00 | 0 | 0 | 0 | 0 | 322.10 | 0 | 0 | 0 | 0 | 518.75 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322.10 | 354.31 | 389.74 | 428.72 | 471.59 | 518.75 | 570.62 | 627.68 | 690.45 |
| Interest | 1,500.00 | 1,499.91 | 1,499.88 | 1,499.81 | 1,499.70 | 1,499.66 | 1,499.57 | 1,499.28 | 1,499.22 | 1,499.13 | 1,499.02 | 1,498.75 | 1,498.54 | 1,498.35 |
| Total expenses | 2,552.05 | 2,600.51 | 2,562.64 | 2,527.29 | 2,494.72 | 3,490.67 | 3,000.71 | 3,033.11 | 3,063.87 | 3,110.22 | 3,949.81 | 3,220.27 | 3,290.61 | 3,371.11 |
| Net revenues | 2.95 | .99 | 2.56 | 3.51 | 1.40 | 3.03 | 2.83 | 5.77 | 2.05 | 2.34 | 6.04 | 4.75 | 4.29 | 11.85 |
| Payment to principal | 1.48 | .49 | 1.28 | 1.76 | .70 | 1.51 | 1.42 | 4.33 | 1.54 | 1.76 | 4.53 | 3.56 | 3.22 | 8.89 |
| Principal balance | 24,998.52 | 24,998.03 | 24,996.75 | 24,994.99 | 24,994.29 | 24,992.78 | 24,991.36 | 24,987.03 | 24,985.49 | 24,983.73 | 24,979.20 | 24,975.64 | 24,972.42 | 24,963.53 |

ASSUMPTIONS: Average ECG's per year: 336
Alcoa and General Foods' user agreements, $5.00 per ECG (in first year)
10% inflation
Meet minimum annual payment
No first-year use royalty, as per franchise agreement

## TABLE 8

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG | $7.00 | $7.70 | $8.47 | $9.32 | $10.25 | $11.27 | $12.40 | $13.64 | $15.01 | $16.51 | $18.16 | $19.97 | $21.97 | $24.17 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECGs per year | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 | 460 |
| Gross revenues | 0 | $3,542 | $3,896 | $4,287 | $4,715 | $5,184 | $5,704 | $6,274 | $6,905 | $7,595 | $8,354 | $9,186 | $10,106 | $11,118 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 |
| Billing fee | 0 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 |
| WATS fee | 0 | 506 | 557 | 612 | 672 | 741 | 814 | 897 | 984 | 1,086 | 1,191 | 1,311 | 1,444 | 1,587 |
| Distributor & commission | 0 | 354 | 390 | 429 | 472 | 518 | 570 | 627 | 691 | 760 | 835 | 919 | 1,011 | 1,112 |
| Additional distributor commission | 0 | 220 | 0 | 0 | 0 | 0 | 354 | 0 | 0 | 0 | 0 | 571 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Interest | 1,500 | 1,500 | 1,481 | 1,446 | 1,401 | 1,346 | 1,287 | 1,227 | 1,142 | 1,042 | 924 | 787 | 646 | 464 |
| Total expenses | 1,500 | 2,893 | 2,741 | 2,800 | 2,858 | 3,240 | 3,692 | 3,454 | 3,559 | 3,673 | 3,782 | 4,472 | 4,042 | 4,166 |
| Net revenues | (1,500) | 649 | 1,155 | 1,487 | 1,857 | 1,944 | 2,012 | 2,820 | 3,346 | 3,922 | 4,572 | 4,714 | 6,064 | 6,952 |
| Payment to principal | 0 | 325 | 575 | 750 | 917 | 983 | 1,000 | 1,417 | 1,666 | 1,967 | 2,283 | 2,350 | 3,034 | 3,480 |
| Principal balance | $25,000 | $24,675 | $24,100 | $23,350 | $22,433 | $21,450 | $20,450 | $19,033 | $17,367 | $15,400 | $13,117 | $10,767 | $7,733 | $4,253 |

ASSUMPTIONS: Leave balance of approximately $4,000 after year 14
12-month delay in placement
10% inflation
Income and expense projections rounded to even dollars

TABLE 9

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG | $5.00 | $5.50 | $6.05 | $6.66 | $7.32 | $8.05 | $8.86 | $9.74 | $10.72 | $11.79 | $12.97 | $14.27 | $15.69 | $17.26 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.33 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECGs per year | 0 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 |
| Gross revenues | 0 | $3,960 | $4,356 | $4,795 | $5,270 | $5,796 | $6,379 | $7,013 | $7,718 | $8,489 | $9,338 | $10,274 | $11,297 | $12,427 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |
| Billing fee | 0 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 |
| WATS fee | 0 | 792 | 871 | 950 | 1,051 | 1,159 | 1,274 | 1,404 | 1,541 | 1,699 | 1,865 | 2,052 | 2,261 | 2,484 |
| Distributor & commission | 0 | 396 | 436 | 480 | 527 | 580 | 638 | 701 | 772 | 849 | 934 | 1,027 | 1,130 | 1,243 |
| Additional distributor commission | 0 | 220 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 571 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Interest | $1,500 | 1,500 | 1,482 | 1,440 | 1,405 | 1,350 | 1,292 | 1,232 | 1,147 | 1,046 | 927 | 788 | 644 | 458 |
| Total expenses | 1,500 | 3,364 | 3,245 | 3,243 | 3,439 | 3,867 | 4,368 | 4,183 | 4,345 | 4,522 | 4,701 | 5,465 | 5,119 | 5,331 |
| Net revenues | (1,500) | 596 | 1,111 | 1,452 | 1,831 | 1,929 | 2,011 | 2,830 | 3,373 | 3,967 | 4,637 | 4,809 | 6,178 | 7,096 |
| Payment to principal | (1,500) | 298 | 536 | 726 | 965 | 965 | 1,005 | 1,415 | 1,687 | 1,983 | 2,319 | 2,404 | 3,089 | 3,548 |
| Principal balance | 25,000 | 24,702 | 24,146 | 23,400 | 22,505 | 21,540 | 20,535 | 19,120 | 17,433 | 15,450 | 13,131 | 10,727 | 7,638 | 4,090 |

ASSUMPTIONS: Alcoa and General Foods user agreements, $5.00 per ECG (in first year)
    Leave balance of approximately $4,000 after year 14
    12-month placement delay
    10% inflation
    Income and expense projections rounded to even dollars

TABLE 10

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fee per ECG | $7.00 | $7.70 | $8.47 | $9.32 | $10.25 | $11.27 | $12.40 | $13.64 | $15.01 | $16.51 | $18.16 | $19.97 | $21.97 | $24.17 |
| WATS fee | $1.00 | $1.10 | $1.21 | $1.32 | $1.46 | $1.61 | $1.77 | $1.95 | $2.14 | $2.36 | $2.59 | $2.85 | $3.14 | $3.45 |
| ECGs per year | 0 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 |
| Gross revenues | 0 | $4,235 | $4,659 | $5,126 | $5,638 | $6,199 | $6,820 | $7,502 | $8,256 | $9,081 | $9,988 | $10,984 | $12,084 | $13,294 |
| Expenses: | | | | | | | | | | | | | | |
| Royalty | 0 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 |
| Billing fee | 0 | 88 | 87 | 88 | 87 | 88 | 87 | 88 | 87 | 88 | 87 | 88 | 87 | 88 |
| WATS fee | 0 | 605 | 656 | 726 | 803 | 856 | 974 | 1,073 | 1,177 | 1,298 | 1,425 | 1,583 | 1,722 | 1,898 |
| Distributor & commission | 0 | 424 | 466 | 513 | 564 | 620 | 682 | 750 | 826 | 908 | 999 | 1,098 | 1,208 | 1,329 |
| Additional distributor commission | 0 | 220 | 0 | 0 | 0 | 0 | 354 | 0 | 0 | 0 | 0 | 571 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 322 | 354 | 390 | 429 | 472 | 519 | 571 | 628 | 690 |
| Interest | $1,500 | 1,500 | 1,466 | 1,415 | 1,352 | 1,275 | 1,193 | 1,106 | 992 | 858 | 702 | 523 | 334 | 99 |
| Total expenses | 1,500 | 3,112 | 2,960 | 3,017 | 3,081 | 3,466 | 3,919 | 3,682 | 3,786 | 3,899 | 4,007 | 4,694 | 4,259 | 4,379 |
| Net revenues | (1,500) | 1,123 | 1,699 | 2,109 | 2,557 | 2,733 | 2,901 | 3,820 | 4,470 | 5,182 | 5,981 | 6,290 | 7,825 | 8,915 |
| Payment to principal | (1,500) | 562 | 849 | 1,055 | 1,278 | 1,367 | 1,450 | 1,910 | 2,235 | 2,591 | 2,991 | 3,145 | 3,912 | 1,655 |
| Principal balance | 25,000 | 24,438 | 23,589 | 22,534 | 21,256 | 19,889 | 18,439 | 16,529 | 14,294 | 11,703 | 8,712 | 5,567 | 1,655 | 0 |
| Franchisee's net share of Pre-tax profits | (1,500) | 561 | 850 | 1,054 | 1,279 | 1,366 | 1,451 | 1,910 | 2,235 | 2,591 | 2,990 | 3,145 | 3,913 | 7,260 |

ASSUMPTIONS: Usage at average usage level claimed in Comp-U-Med's offering circular (550 ECGs per year)
    12-month delay in placement
    10% inflation
    Income and expense projections are rounded to even dollars
    Franchisee's total net share of pre-tax profits: $29,104

undermine Comp-U-Med's "bathtub curve" view of maintenance expenses, which they see as occurring only in the early and late years of the franchises. We have used an initial figure of $200, which is one-fifth of what Comp-U-Med determined to be the cost of its initial 5-year warranty.

5. Dr. Stancill's projections contemplated that inflation would increase the gross revenues over the 14-year period, and yet his projections used constant, uninflated expense figures. We see no basis for employing inflation considerations for revenues but not for expenses, and petitioners have not presented any convincing argument why the effect of inflation on the expenses should be ignored. Accordingly, those projections that contemplate the effect of inflation on revenues likewise reflect inflation of the expenses for WATS long-distance telephone charges, maintenance, and the additional commission for subsequent replacement by the distributor. The distributor's general commission, 10 percent of gross revenues, will necessarily reflect the inflation element of gross revenue projections. The royalties and billing fees due Comp-U-Med, however, are not adjusted; the franchise agreement sets flat rates for these items until the note is paid in full.

6. For those projections employing inflation considerations, we have used Dr. Stancill's figure of 10 percent. Although experience shows a lower rate in recent years, we think that 10 percent was reasonable as of the time petitioners acquired their franchises (December 1980). A lower inflation rate would require higher average use for full payment; consequently, our ultimate conclusions would not be affected by using a lower inflation rate that respondent seems to suggest.

7. Amounts paid to principal contemplate that 50 percent of the net revenues above the minimum annual payment goes to Comp-U-Med for the entire 14-year period; thus, none of the projections that contemplate full repayment assume that a franchisee will convert the note from recourse to nonrecourse after the initial 7-year term. If a franchisee renewed the note but left it "recourse," he would remain entitled to 50 percent of the net franchise revenues; if he elected to convert to nonrecourse, he would only be entitled to 25 percent of the net revenues. A franchisee in the

50-percent tax bracket (as contemplated in Comp-U-Med's offering circular) who elected to convert to nonrecourse would have to pay part of his taxes on his revenues out-of-pocket rather than out of his share of the revenues. A franchisee in the 50-percent tax bracket who chose not to convert would be able to pay all his taxes out of his share of the revenues. Consequently, where usage levels generate net revenues approaching the level required to pay off the note under the franchise as structured, a franchisee would normally choose not to convert the note.

8. Dr. Stancill's projections contemplate several years before peak usage levels are met. We have not accepted this approach for Comp-U-Med's own experience negates this assumption. See note 40 *infra*. Moreover, the effect of our use of a uniform average usage beginning in the first year of placement is to petitioners' benefit because it results in a lower peak use than if an increase over several years is posited.

## TABLE 1

### *Projected Tax Benefits and Economic Benefits From a Comp-U-Med Franchise*

Comp-U-Med's offering circular contemplated depreciation under the CLADR System, using $4,000 first-year (bonus) depreciation and the 200-percent double declining balance method, resulting in the following claimed tax deductions:

| Year | Depreciation | Interest and expense | Total |
|------|-----------|----------------------|-------|
| 1 | $10,714 | $3,000 | $13,714 |
| 2 | 4,796 | 1,500 | 6,296 |
| 3 | 3,425 | 1,500 | 4,925 |
| 4 | 2,447 | 1,500 | 3,947 |
| 5 | 1,748 | 1,500 | 3,248 |
| 6 | 1,248 | 1,500 | 2,748 |
| 7 | 892 | 1,500 | 2,392 |
| Total | 25,270 | 12,000 | 37,270 |

These projections contemplate a full year's depreciation during the first year. In addition, the circular contemplated an investment credit of $2,750 in year one, computed on 7-year property with a cost of $27,500. The circular also used a 50-percent effective marginal rate; petitioners were in the 54-percent bracket the year before they acquired their

franchises and were in the 37-percent bracket the year they acquired them. The following projections assume a 50-percent marginal tax rate.

The projected tax benefits of a Comp-U-Med franchise, without discounting for the time value of money, were as follows:

| | |
|---|---|
| Tax deductions | $19,385 |
| Investment credit | 2,750 |
| Cash investment | (6,000) |
| Minimum payments ($1,500 per year) | (10,500) |
| Franchise renewal fee | (200) |
| Conversion payment | (1,000) |
| Depreciation recapture | (12,635) |
| Net value | (8,200) |

This projection assumes that *no* ECG's are performed and that a franchisee converts the note to nonrecourse.

The projected economic profits, based on Comp-U-Med's claimed average usage of 550 ECG's per year, were $29,104 (undiscounted). See table 10 *supra*. Subtracting a franchisee's $6,000 cash investment and $200 franchise renewal fee (the minimum payment is largely met from franchise operations (see table 10 *supra*)), leaves a net pretax return of $22,904.

The present value of the projected tax benefits of a Comp-U-Med franchise, assuming a 10-percent discount rate (see sec. 20.2031-7(f), table B, Estate Tax Regs.), was as follows:

| | |
|---|---|
| Tax deductions | $15,113 |
| Investment credit | 2,750 |
| Cash investment | (6,000) |
| Minimum payments (present cost) | (7,303) |
| Franchise renewal fee | (103) |
| Conversion payment | (513) |
| Depreciation recapture (present cost) | (3,327) |
| Net present value | 617 |

The present value of the projected net income stream, also assuming a 10-percent discount rate, was approximately $10,700. Subtracting a franchisee's $6,000 cash investment in year one and his franchise renewal fee in year 8 (present cost $103) leaves a net pretax return with a present value of $4,597.

The present value of the tax benefits of the investment would be somewhat lower to investors (like petitioners) who acquired their franchises at the end of the year and thus would be unable to obtain the full first-year's depreciation. Moreover, investors (like petitioners) who acquired several terminals would have to spread their additional first-year depreciation among all of their terminals, rather than claiming the full bonus depreciation for each terminal as Comp-U-Med's offering circular seems to contemplate.

## ULTIMATE FINDINGS OF FACT

1. Petitioners engaged in their Comp-U-Med ECG terminal franchise activity with the actual and honest objective of deriving an economic profit.

2. Petitioners' computerized ECG terminals were placed in service during 1980.

3. The fair market value of a new Comp-U-Med Model 107 ECG Terminal during 1980 was no more than $6,500.

4. Petitioners' purchase money note in the principal amount of $25,000 is too contingent and speculative to be treated as a true indebtedness for Federal tax purposes.

5. The recourse obligation represented by the minimum annual payment, the franchise renewal fee, and the payment for conversion to nonrecourse is a bona fide debt for Federal tax purposes.

6. The portion of petitioners' purchase money note for the terminals that constitutes bona fide debt and that exceeds the fair market value of the terminals themselves represents part of the costs of petitioners' Comp-U-Med franchises.

7. Comp-U-Med has an interest in the net profits of petitioners' ECG terminal leasing activity other than as a creditor.

## OPINION

This is a test case, involving one of about 2,000 investors in Comp-U-Med's ECG terminal franchises. The case raises a number of tax issues. Although the investment was obviously structured to try to get around the "at risk" limitations of section 465, it is hardly the typical abusive tax shelter scenario.

Petitioners purchased four of Comp-U-Med's franchises, each of which included the purchase of one of Comp-U-Med's computerized electrocardiogram (ECG) terminals. For each franchise and terminal, petitioners paid $6,000 in cash and executed a promissory note of $25,000. Comp-U-Med labeled $500 of the $6,000 as a "franchise fee" and $3,000 as a "first year royalty." Comp-U-Med allocated the remaining $2,500 of cash and all of the $25,000 note to the ECG terminal, for a purported purchase price of $27,500 per terminal. The term of the franchise was 7 years (initial term) but upon payment of a $200 fee, petitioners could renew the franchise for an additional term of 7 years (extension term). The promissory note was labeled as "recourse" and was also for a 7-year term. During the initial term, petitioners' only obligation under the note was to make a minimum payment of $1,500 per year, which was denominated as interest at the stated rate of 6 percent of the stated principal of $25,000. Any payment of principal was due only out of net exploitation revenues from petitioners' leasing of the ECG terminals to users such as primary care physicians or clinics. At the end of the initial 7-year term, if petitioners renewed the franchise they could also renew the note for the extension term of the franchise and, upon payment of $1,000, could convert the note to nonrecourse. On its books, Comp-U-Med treated the $25,000 promissory note as a contingent liability. On its balance sheets, Comp-U-Med recorded the notes as long-term notes receivable, assigning as their value the discounted present value of the minimum annual payments of $1,500 for 7 years, plus the $1,000 to convert the note to nonrecourse. On their tax return for 1980, the year of purchase, petitioners claimed depreciation and an investment tax credit computed on the full amount of $27,500 per terminal. Petitioners also deducted royalty expenses and other expenses relating to their Comp-U-Med ECG terminal franchises.

Respondent's broad assault on petitioners' tax-advantaged investment includes several overlapping and alternative arguments. Since respondent's profit-motive arguments,

if accepted, would be wholly or largely dispositive of the case before us, we will first address those issues.

## I. Trade or Business (Sec. 162) or For-Profit Activity (Sec. 212)

Although in his statutory notice of deficiency respondent allowed a portion of petitioners' claimed deduction for the first-year royalty, he now contends that none of the claimed royalty and depreciation deductions, nor the investment credit, are allowable.[18] Respondent argues that petitioners' acquisition or operation of their franchises was not an activity engaged in for profit. Alternatively, with respect to the claimed royalty deduction, respondent contends that it was a nondeductible startup expense because petitioners were not engaged in a "trade or business" during the taxable year in issue.

### A. Profit objective

Petitioners' claimed deductions and credit hinge upon whether petitioners entered into their Comp-U-Med franchise venture for the predominant purpose of deriving a profit.[19] Although petitioners' profit motive need not be reasonable, nonetheless, they must have had an actual and honest profit objective. Sec. 1.183-2(a), Income Tax Regs.;

---

[18]In the statutory notice respondent also allowed all of petitioners' claimed deduction for legal and professional expenses. On brief, respondent asks for an increased deficiency to reflect his argument for complete disallowance of the royalty deduction; however, he has not sought to revoke his allowance of petitioners' legal and professional expenses, reflecting their $750 management fee (per terminal). Accordingly, we will not address the deductibility of these expenses, although we note that respondent's arguments for disallowing the royalty deduction would appear to apply equally to the management fee. Our resolution of the issues in dispute obviates the need to address respondent's request for an increased deficiency.

[19]Sec. 167(a) permits a depreciation deduction of a reasonable allowance for the exhaustion of (1) property used in a trade or business, or (2) property held for the production of income. Carrying on a trade or business is also a prerequisite to deductibility of business expenses under sec. 162. An activity does not constitute a trade or business unless the taxpayer engages in the activity for the predominant purpose and intention of making a profit. *Ramsay v. Commissioner*, 83 T.C. 793, 810 (1984); *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Brannen v. Commissioner*, 78 T.C. 471, 505-506 (1982), affd. 722 F. 2d 695 (llth Cir. 1984); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979). The same kind of profit-making objective is a prerequisite for deductions under sec. 212(1) and (2), *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981); *Jasionowski v. Commissioner*, 66 T.C. 312, 318-319 (1976), and for the investment tax credit under sec. 38. *Flowers v. Commissioner*, *supra* at 931 n. 24; *Pike v. Commissioner*, 78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F. 2d 164 (9th Cir. 1984). See also *Elliott v. Commissioner*, 84 T.C. 227, 236-237 (1985), affd. without published opinion 782 F. 2d 1027 (3d Cir. 1986); *Sutton v. Commissioner*, 84 T.C. 210, 221 (1985), affd. 788 F.2d 695 (llth Cir. 1986).

*Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner*, 634 F.2d 5 (3d Cir. 1984), *Leffel v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), *Rosenblatt v. Commissioner*, 734 F.2d 7 (3d Cir. 1984), *Zemel v. Commissioner*, 734 F.2d 9 (3d Cir. 1984); *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Dreicer v. Commissioner*, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In this context, the requisite element is economic profit, independent of tax savings. *Ramsay v. Commissioner*, 83 T.C. 793, 810 (1984); *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983).

Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit.[20] These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Case law provides other relevant factors. See, e.g., *Estate of Baron v. Commissioner*, 83 T.C. 542, 558-559 (1984); *Flowers v. Commissioner*, 80 T.C. at 937. No single factor is determinative; rather, the issue is one of fact to be resolved by examining all of the circumstances. *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 74 (1984); *Fox v. Commissioner*, 80 T.C. at 1007;

---

[20]Sec. 183 is actually an allowance provision, rather than a disallowance provision, permitting limited deductions for activities not motivated by profit. *Brannen v. Commissioner*, 78 T.C. at 500; *Siegel v. Commissioner*, 78 T.C. 659, 696-697 (1982). Nevertheless, the inquiry into the taxpayer's profit-making objective is the same. Sec. 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Accordingly, the factors listed in sec. 1.183-2(b), Income Tax Regs., provide a useful framework for resolving this factual issue. *Flowers v. Commissioner*, 80 T.C. at 931-932; *Brannen v. Commissioner, supra*; *Wildman v. Commissioner*, 78 T.C. 943, 953-954 (1982); *Siegel v. Commissioner*, 78 T.C. at 699.

*Flowers v. Commissioner*, 80 T.C. at 931-932; *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F. 2d 578 (2d Cir. 1980). In making this factual determination, we give greater weight to objective factors than to the taxpayers' mere statements of their intent. Sec. 1.183-2(a), Income Tax Regs.; *Fuchs v. Commissioner, supra*; *Dean v. Commissioner, supra*; *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

There are a few factors mentioned in the regulations that tend to indicate the absence of a profit objective, such as petitioners' losses during the years in evidence (1980-82), their acquisition and use of assets that will depreciate rather than appreciate in value over time, and their relatively high income ($80,000 taxable income in 1979, placing them in the 54-percent marginal rate bracket, based on a joint return). The existence of losses (both cash and tax), however, is not determinative, particularly where, as here, they arise in the early years of an investment when losses may often be expected. See sec. 1.183-2(b)(6), Income Tax Regs. Similarly, the concurrent existence of other income against which any losses from the activity may be used is not conclusive; it merely serves to pose the question.[21] As we stated in *Engdahl v. Commissioner, supra* (72 T.C. at 670):

As long as tax rates are less than 100 percent, there is no "benefit" in losing money. * * * The essential question remains as to whether there was a genuine hope of economic profit. * * *

These negative factors do not outweigh the strong inference of profit motive created by the reasoned, businesslike acquisition and operation of ECG terminal franchises by experienced business persons and investors like petitioners. Based on all of the evidence of record, we are convinced

---

[21]The weight to be ascribed to this factor is in any event unclear. If, as respondent suggests, petitioners were merely sophisticated investors purchasing a yearend tax shelter, they would undoubtedly have been aware that their 1980 taxable income, before purchasing a shelter, was only about $34,000, placing them in a 37-percent marginal rate bracket. Most tax shelters are targeted at higher bracket taxpayers. On the other hand, petitioners' claimed losses from their Comp-U-Med franchise allowed them to eliminate completely their 1980 taxable income and tax liability and carry the unused 1980 investment credit back to 1977. It was a notice of deficiency for 1977 in regard to a family trust that prompted petitioners to contact the attorney and investment advisor who eventually led them to invest in their Comp-U-Med franchises.

that petitioners acquired and exploited their Comp-U-Med franchises with the requisite profit objective.

Petitioners, already successful in managing their business and their investment real estate, chose an equipment leasing venture to diversify their holdings; they were also attracted to the Comp-U-Med franchise because they viewed it as modern "high tech." Petitioners acquired their Comp-U-Med franchises upon the recommendation of their attorney and investment advisor; the advisor recommended the franchise investment only after an independent investigation he had directed to be performed appeared to corroborate the market description and usage projections in Comp-U-Med's offering circular. Although petitioners were interested in the prospective tax benefits from the Comp-U-Med franchises, they chose the Comp-U-Med investment over other potential investments because they and their advisor believed that the ECG terminal franchise offered a realistic profit potential.

Having acquired their franchises, petitioners immediately retained Medical Management Group (MMG) to perform management services and contracted with medical equipment distributors to place their terminals with actual users. Although both MMG and the equipment distributors apparently were identified to petitioners (and other franchisees) by Comp-U-Med, these firms were independent of Comp-U-Med. Several of petitioners' terminals were first placed with users shortly after petitioners had changed distributors (at MMG's recommendation). This indicates that MMG took seriously its task as management consultant and that MMG and the distributors were also independent of each other. Since petitioners had no experience in medical equipment leasing, their profit objective in operating their franchises is corroborated, not undermined, by their use of a retained consultant and hired distributors. Indeed, their profit objective might well be suspect had they, inexperienced as they were in computerized ECG equipment, purported to try to manage their franchises and place the terminals themselves.

As stated in our ultimate findings, *supra*, and explained in Part IIB, *infra*, we have determined that a substantial portion of petitioners' purchase money note is not a true indebtedness for Federal tax purposes. However, while we have considered that factor here, it is not determinative as to

petitioners' profit objective. Cases such as *Estate of Baron v. Commissioner, supra,* and *Flowers v. Commissioner, supra,* involved far more grossly inflated purchase prices, attributable to nonrecourse purchase money notes, which indicated that those taxpayers were just buying tax deductions, not entering into economically motivated investments.[22] From the conclusion that a portion of the purchase money indebtedness is too speculative and contingent to be treated as a true debt for tax purposes, it does not necessarily follow that petitioners' overall investment was not profit motivated. Of course some inflation of the purchase price and note occurred in this case as will be discussed in Part IIB *infra.*

Finally, we note that unlike *Estate of Baron v. Commissioner, supra,* there is no substantial disparity between the projected net tax benefits and projected economic profits over the 14-year period. Quite to the contrary, on both a gross dollar basis and present value basis, here the projected economic profits exceeded expected net tax benefits. See appendix to findings of fact, table 11, *supra.*[23] On a per terminal basis, revenues at the usage levels claimed in Comp-U-Med's offering circular could, depending on the actual effect of inflation, repay the entire $25,000 purchase money note over its effective 14-year term, while returning substantial before-tax income to petitioners. Although these projections were, on the whole, far too optimistic, they appeared reasonable to petitioners and their advisor at the time they acquired their franchises. The apparent economic viability of the Comp-U-Med franchise, based on the information known to petitioners and their advisor at the time of the franchise acquisition, indicates that petitioners' investment was profit motivated. Based on the entire record, we are persuaded that petitioners acquired and operated their ECG terminal franchises with the actual and honest objective of earning real monetary profits.[24]

---

[22]See also *Burpee v. Commissioner,* T.C. Memo. 1983-710.

[23]It is unclear whether potential depreciation recapture is to be considered in evaluating the projected tax benefits. See and compare *Rice's Toyota World, Inc. v. Commissioner,* 752 F. 2d 89 (4th Cir. 1985), affg. on this point 81 T.C. 184 (1983); *Elliott v. Commissioner,* 84 T.C. 227, 238 n. 4 (1985); *Estate of Baron v. Commissioner,* 83 T.C. 542, 556-557 n. 39 (1984). We express no opinion on this point since in the instant case, the projected economic profits, both on a gross and present value basis, exceeded the expected tax benefits even when potential depreciation recapture is ignored. See appendix, table 11.

[24]The issue of petitioners' profit objective is a "new matter" upon which respondent bears the burden of proof. Rule 142(a). However, our determination is based on the entire record, and we would reach the same result here regardless of which party had the burden of proof.

*B. Deductibility of first-year "royalty"*

Ordinary and necessary expenses generally are deductible, whether incurred in a trade or business (sec. 162(a)), or in a profit-motivated activity not rising to the level of a trade or business. Sec. 212(l), (2). No current deduction is allowed, however, for an expenditure that results in the acquisition of an asset with a useful life extending substantially beyond the close of the taxable year. Secs. 1.212-1(n), 1.263(a)-2(a), Income Tax Regs.; *Commissioner v. Idaho Power Co.*, 418 U.S. 1 (1974); *Woodward v. Commissioner*, 410 F.2d 313, 318 (8th Cir. 1969), affd. 397 U.S. 572 (1970). Such capital expenditures must be recovered through depreciation or amortization over the asset's useful life, or taken into account in the determination of gain or loss upon taxable disposition of the asset. *Woodward v. Commissioner*, 397 U.S. at 575-576; *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 577-578 (1980). Moreover, no current business expense deduction (sec. 162(a)) is allowed for expenditures incurred prior to the beginning of actual business operations. *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); *Goodwin v. Commissioner*, 75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 566-567 (1979), affd. 633 F.2d 512 (7th Cir. 1980). See also *Todd v. Commissioner*, 77 T.C. 246, 249-250 (1981), affd. per curiam 682 F.2d 207 (9th Cir. 1982).[25] We have held, however, that the preopening expense doctrine does not apply to amounts deductible under section 212(2), paid or incurred for the management, conservation, or maintenance of property held for the production of income. *Hoopengarner v. Commissioner*, 80 T.C. 538 (1983), affd. without published opinion 745 F. 2d 66 (9th Cir. 1984).[26]

Respondent allowed $600 per terminal of petitioners' claimed "first-year royalty," which he determined was the highest allowable ECG processing royalty as based on

[25]Sec. 195, applicable to amounts paid or incurred after July 29, 1980, allows the elective amortization of these nondeductible preopening expenses over 60 months (or more).

[26]We note that the Eighth Circuit Court of Appeals has recently declined to follow *Hoopengarner.* See *Aboussie v. Commissioner*, 779 F. 2d 424, 428-429 n. 6 (8th Cir. 1985).

projected and actual use. Respondent disallowed the remaining $2,400 per terminal as nondeductible "startup" costs, and now argues that none of the claimed $3,000 "first-year royalty" per terminal should be allowed. We agree that none of the prepaid "first-year royalty" is deductible but for a different reason.

The startup costs for which deductions are disallowed under the preopening expense doctrine are expenses that *would* have been deductible *had* they been paid or incurred in a trade or business. Deductions for startup costs are disallowed because the taxpayer has not yet commenced his trade or business. *Richmond Television Corp. v. United States, supra; Hoopengarner v. Commissioner, supra,* 80 T.C. at 540; *Goodwin v. Commissioner, supra.* Capital expenditures, however, are nondeductible regardless of whether the taxpayer has begun a trade or business.

Petitioners paid a "franchise fee" of $500 per franchise; the franchise rights were clearly more valuable than that nominal sum. Petitioners' franchise rights included ECG processing and billing at nominal rates, use of Comp-U-Med's goodwill and other intangibles (enhanced by Comp-U-Med's advertising), training users in operating the terminals, and liability insurance. On its books, Comp-U-Med allocated the $3,000 per terminal "first-year royalty" to these various categories of franchise rights. The manner in which Comp-U-Med allocated its franchisees' first-year royalty fees on its books thus tracks the bundle of franchise rights almost exactly. These intangible rights, acquired for the term of the franchise, are quintessentially capital expenditures and thus are nondeductible. See *Seligman v. Commissioner,* 84 T.C. 191, 201-203 (1985).

## II. Depreciation and Investment Tax Credit

Respondent disallowed all of petitioners' depreciation deductions and the investment tax credit claimed for their Comp-U-Med ECG terminals. Respondent's primary position is that the terminals were not placed in service during the taxable year in issue.[27] Alternatively, respondent's remain-

---

[27]Since respondent as well as petitioners pushed to have this case go to trial as the test case for the Comp-U-Med terminal franchise investment, the Court finds it rather curious that respondent now presses this argument and the profit-motive argument (which we have rejected

ing arguments are that petitioners' purchase money note should not be included in basis because it was not a "true debt for Federal tax purposes, and that in any event, petitioners' losses are limited to their cash investment because that is the extent to which they are "at risk" under section 465.

## A. Placed in service

Depreciation and the investment credit are allowed in the year in which the qualifying property is placed in service by the taxpayer. Secs. 38(a), 46(a)(1), 46(a)(2), 46(c)(1); secs. 1.46-3(a)(l), 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs. Property is placed in service when it is "placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Secs. 1.46-3(d)(1)(ii), 1.167(a)-11(e)(1)(i), Income Tax Regs.

Respondent's sole argument in support of his position that petitioners' terminals were not placed in service is that petitioners had not acquired the terminals (e.g.; had no possessory interest in the terminals) during the taxable year in issue. Respondent reads the franchise agreement as requiring petitioners to execute a UCC-1 financing statement as a condition precedent to delivery of the terminals; he concludes that petitioners had no possessory interest in 1980 because they did not sign the UCC-1 until 1981. We have rejected respondent's construction of the agreement (see note 9 *supra*), and we conclude that petitioners had the right to direct delivery of the terminals (whether to themselves, to their distributors, or to their ultimate users) as of December 30, 1980, the day Comp-U-Med approved their franchise application.

For an asset to be "placed in service" for purposes of depreciation and the investment credit, it is not necessary that the property actually be used during the taxable year in the taxpayer's profit-motivated venture. It is sufficient that the property be available for use. *Sears Oil Co. v.*

above), which would obviate the need to reach the real Comp-U-Med issues. We suspect respondent's reliance on these issues on brief is more related to his unhappiness with some of the Court's evidentiary rulings than to some belatedly perceived merit in these issues. See notes 16 & 24 *supra*.

*Commissioner*, 359 F. 2d 191, 198 (2d Cir. 1966); *SMC Corp. v. United States*, an unreported case (E.D. Tenn. 1980, 80-2 USTC par. 9642, 46 AFTR 2d 80-5827), affd. per curiam 675 F. 2d 113 (6th Cir. 1982).[28] See also *Grow v. Commissioner*, 80 T.C. 314, 326-327 (1983). Property held for leasing to others is placed in service when it is first held out for lease.[29] That petitioners executed distribution agreements for their terminals simultaneously with their purchase clearly shows that the terminals were available to be used in petitioners' profit-motivated leasing venture from the date of purchase.[30] We conclude that petitioners' terminals were placed in service in 1980.

## B. Includability in basis of purchase money note

For purposes of depreciation (and amortization), a taxpayer's basis in purchased property is his cost, and his cost includes valid liabilities incurred in acquiring the property. *Crane v. Commissioner*, 331 U.S. 1 (1947); *Parker v. Delaney*, 186 F. 2d 455 (1st Cir. 1950); *Blackstone Theatre Co. v. Commissioner*, 12 T.C. 801, 804 (1949). The same basis rules apply for determining the taxpayer's qualified investment for purposes of the investment credit. Sec. 1.46-3(c), Income Tax Regs.; *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 601-602, 505 F. 2d 1266, 1269 (1974).

Recourse liabilities generally pose no difficulty because of the taxpayer's fixed, unconditional obligation to pay, with interest,[31] a specific sum of money. A nonrecourse liability, however, is more problematical because it lacks the personal obligation to pay. Nonetheless, a nonrecourse liability is a lien that the taxpayer must satisfy according to its terms to retain possession and use of the encumbered property. A nonrecourse liability can be a true loan that will be included in a taxpayer's cost basis; the finding that a nonrecourse debt is a true loan is "predicated on the assumption that the mortgage will be repaid in full." *Commissioner v. Tufts*, 461 U.S. 300, 308 (1983). See *Crane v. Commissioner*, 331

---

[28]See also *Gilmartin v. Commissioner*, T.C. Memo. 1984-194; *Helfand v. Commissioner*, T.C. Memo. 1984-102; *Riss & Co. v. Commissioner*, T.C. Memo. 1964-190.

[29]See *Helfand v. Commissioner, supra; Riss & Co. v. Commissioner, supra.*

[30]See *Gilmartin v. Commissioner, supra.*

[31]See sec. 483.

U.S. at 14 (fn. ref. omitted), where the Supreme Court was concerned with "the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the [nonrecourse] mortgage exactly as if they were his personal obligations." See also *Mayerson v. Commissioner*, 47 T.C. 340, 352 (1966), where we said "It can be assumed that a capital investment in the amount of the mortgage will eventually occur despite the absence of personal liability." See also *Odend'hal v. Commissioner*, 748 F. 2d 908, 913 (4th Cir. 1984), affg. 80 T.C. 588 (1983).

Because of the potential abuse that inheres in the allowance of deductions in excess of the cash investment, the courts have endeavored to test the validity of the repayment assumption and have excluded from basis nonrecourse obligations that were not likely to be paid. See and compare *Gibson Products Co. v. United States*, 637 F. 2d 1041, 1047-1048 (5th Cir. 1981); *Estate of Franklin v. Commissioner*, 544 F. 2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Fox v. Commissioner*, 80 T.C. at 1020-1023; *Brannen v. Commissioner*, 78 T.C. at 493-499. Contrary to petitioners' arguments, these judicial doctrines for evaluating nonrecourse obligations as part of cost basis vel non were not vitiated by the Supreme Court's decision in *Commissioner v. Tufts, supra*. See *Herrick v. Commissioner*, 85 T.C. 237, 261-262 (1985).[32]

We also reject petitioners' argument that the at risk rules of section 465 supersede these judicial doctrines for testing the inclusion of purported nonrecourse debt in basis. The at risk rules do not replace the rules for basis determination. See S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86.[33] First, the at risk rules do not apply to all transactions that can give rise to tax losses. See sec. 465(c)(1), (3). Second, until 1981, there was no at risk limitation applicable to the investment credit; a taxpayer's qualified investment thus depended upon traditional basis principles. See sec. 46(c); sec. 1.46-3(c)(l), Income Tax Regs. Section 46(c)(8), which

---

[32]See also *Odend'hal v. Commissioner*, 748 F.2d 908, 912-913 (4th Cir. 1984), affg. 80 T.C. 588 (1983); *Brannen v. Commissioner*, 722 F. 2d 695, 702 n. 4 (llth Cir. 1984), affg. 78 T.C. 471 (1982); *Flowers v. Commissioner, supra*, 80 T.C. at 943-944 n. 44; *Fox Park Corp. v. Commissioner*, T.C. Memo. 1985-451.

[33]See sec. 1.465-1(e), Proposed Income Tax Regs., 44 Fed. Reg. 32,237 (June 5, 1979).

limited a taxpayer's basis for investment credit purposes to his amounts at risk, applies only to property placed in service after February 18, 1981, and thus does not apply to this case. See sec. 211(i)(5), Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 235, 1981-2 C.B. 256, 291. Section 46(c)(8) has since been amended. See sec. 431(a), Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 805-807, 1984-3 C.B. (Vol. 1) 1, 313, 315. Finally, the validity of the purported nonrecourse loan affects the characterization of Comp-U-Med's interest in applying the at risk rules. See part IIC of this opinion *infra*. Thus, we must consider whether the purported nonrecourse liability (the $25,000 note) in this case is true debt for basis purposes.

In determining whether a purported nonrecourse liability is to be treated as a true debt for Federal tax purposes, the courts have used various approaches. One line of cases looks at the fair market value of the property in relation to the stated purchase price and/or the principal amount of the indebtedness. This line of cases treats a nonrecourse obligation as a true debt only if the acquired property reasonably secures payment of the obligation; where the nonrecourse obligation is not adequately secured, a purchaser would acquire no equity in the property and therefore would have no economic incentive to repay the note. Put differently, as stated by the Ninth Circuit in the leading case of *Estate of Franklin v. Commissioner*, 544 F. 2d at 1048:

An acquisition * * * at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. * * *

See also *Odend'hal v. Commissioner*, 80 T.C. 588, 604-605 (1983), affd. 748 F.2d 908 (4th Cir. 1984); *Hager v. Commissioner*, 76 T.C. 759, 773-774 (1981); *Narver v. Commissioner*, 75 T.C. 53, 98-100 (1980), affd. per curiam

670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534, 1552 (1980), affd. 678 F. 2d 818 (9th Cir. 1982).[34]

The other major approach holds that an obligation, even if recourse, will not be treated as a true debt where payment, according to its terms, is too contingent. See *Denver & Rio Grande Western R.R. Co. v. United States*, *supra*, (obligation payable at rate of 32 percent of carload freight traffic revenue after movement of 100,000 net tons per year); *Lemery v. Commissioner*, 52 T.C. 367 (1969), affd. per curiam on another issue 451 F.2d 173 (9th Cir. 1971) (obligation contingent upon business sold showing net profit); *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966), cert. denied 385 U.S. 827 (1966) (obligation to pay based on mileage of railroad lines); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964) (obligation for severance pay—incurred as part of acquisition of assets of predecessor corporation—contingent upon failure to give employees notice prior to closing plant). This "contingent obligation" approach has been applied recently in tax shelter cases involving nonrecourse loans where the principal was payable out of exploitation proceeds. See, e.g., *CRC Corp. v. Commissioner*, 693 F. 2d 281 (3d Cir. 1982), affg. in relevant part, revg. and remanding on other grounds *Brountas v. Commissioner*, 73 T.C. 491 (1979) (payment of note contingent upon discovery of recoverable amounts of oil or gas); *Brountas v. Commissioner*, 692 F.2d 152 (lst Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979) (same); *Gibson Products Co. v. United States*, 637 F. 2d 1041 (5th Cir. 1981) (same);[35] *Estate of Baron v.*

---

[34]We note that in *Brannen v. Commissioner, supra*, we stated that the test was whether the stated purchase price unreasonably exceeds the value of the property (78 T.C. at 493), whereas in *Hager v. Commissioner*, 76 T.C. 759 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeds the value of the property (76 T.C. at 773). Because of the facts and the approach that we take in this case, we need not decide which test is appropriate. See *Brannen v. Commissioner*, 78 T.C. at 513 (Chabot, J., concurring).

[35]Our opinion in *Brountas v. Commissioner*, 73 T.C. 491 (1979), did not reach the question of contingency since we determined the nonrecourse notes therein to be production payments under sec. 636. We held that such characterization converted the notes into binding legal obligations regardless of whether repayment was speculative. *Brountas v. Commissioner*, 73 T.C. at 569 n. 84. The First and Third Circuits disagreed, holding that the character of a loan would not change merely because it was treated as a production payment. *Brountas v. Commissioner*, 692 F. 2d 152 (lst Cir. 1982); *CRC Corp. v. Commissioner*, 693 F. 2d 281 (3d

*Commissioner*, 83 T.C. at 550-553 (note payable solely out of proceeds of record sales); *Fox v. Commissioner*, 80 T.C. at 1022-1023 (note payable solely out of book sale proceeds); *Saviano v. Commissioner*, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985) (note payable solely out of sales proceeds of mined gold); *Graf v. Commissioner*, 80 T.C. 944 (1983) (note payable solely out of profits from foreign dredging operation). The contingent liability theory is in many ways complimentary to *Estate of Franklin's* reasonable security approach. *Fox v. Commissioner*, 80 T.C. at 1020.[36] Both theories represent efforts by the courts to validate from objective criteria the assumption upon which a valid nonrecourse debt (for tax purposes) is predicated—the assumption that the obligation will be paid. A nonrecourse debt will be recognized for tax purposes only if it appears likely from all the facts and circumstances that the obligation will be paid.

We think that petitioners' purchase money note must be tested under these principles. That the note was labeled "recourse" is not of itself relevant; substance, not form, must govern. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Zmuda v. Commissioner*, 731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982). See also *Houchins v. Commissioner*, 79 T.C. 570, 589-590, 598-601 (1982). Since the note was convertible to nonrecourse before the end of the 14-year renewable term contemplated by the parties, and since (except for the $1,000 conversion fee) payment of principal (prior to maturity) was due only out of net revenues, the facially recourse note takes on a strong nonrecourse flavor. Even if recourse, a note will not be recognized if its payment is unlikely. See *Denver & Rio Grande Western R.R. Co. v. United States, supra*; *Columbus & Greenville Railway Co. v. Commissioner, supra*; *Albany Car Wheel Co. v. Commissioner, supra*. Moreover, the note's recourse label

Cir. 1982). Our citations to the Circuit Courts' opinions in *CRC Corp.*, *Brountas*, and *Gibson Products Co.*, are for the contingent obligation theory. The instant case does not present an opportunity to accept or reject those courts' views of the role of sec. 636, the provision upon which we decided *Brountas*. See *Saviano v. Commissioner*, 80 T.C. 955, 963 n. 9 (1983), affd. 765 F. 2d 643 (7th Cir. 1985); *Graf v. Commissioner*, 80 T.C. 944, 950 n. 7 (1983).

[36]Indeed, the fair market value (if ascertainable) of the property encumbered by the nonrecourse obligation is a factor in determining whether the debt is too contingent to be recognized as a bona fide debt for Federal tax purposes. See *Gibson Products Co. v. United States*, 637 F. 2d 1041, 1047-1049 (5th Cir. 1981).

does not preclude inquiry into the adequacy of the collateral securing the debt. See, e.g., *Houchins v. Commissioner*, 79 T.C. at 598-601.[37] If on the basis of all the facts and circumstances we cannot conclude that payment of petitioners' purchase money note was reasonably likely, we cannot include the note as part of their basis for tax purposes.

The *Estate of Franklin* approach, comparing the value of the encumbered property to the total purchase price and the principal amount of the putative debt, originated in real estate transactions. Most of these real estate cases involved regular payments of interest and/or principal. The taxpayer's failure to make any of the required payments would allow the creditor to proceed against the security. Thus, the value of the property at the inception of the transaction and throughout the term is of great importance in evaluating the likelihood of payment. Despite the doctrine's origin, we have employed the *Estate of Franklin* reasonable security approach in many of the tax shelter cases involving nonrecourse notes payable only out of exploitation proceeds, holding that the notes were not to be recognized for tax purposes. See, e.g., *Fuchs v. Commissioner*, 83 T.C. at 101-103; *Dean v. Commissioner*, 83 T.C. at 77-79; *Flowers v. Commissioner*, 80 T.C. at 942-943; *Wildman v. Commissioner*, 78 T.C. at 951-952; *Brannen v. Commissioner*, 78 T.C. at 493-499. In cases such as these, where the stated purchase price is grossly inflated over the property's fair market value by the purported nonrecourse debt, it is fair to conclude on this basis alone that the "debt" will never be paid and thus to disregard the debt for Federal tax purposes.

When the putative debt is payable only out of exploitation proceeds, however, we do not think that the converse is necessarily true—i.e., that adequate security at the inception of the financing transaction alone mandates the recognition of the loan. While the adequacy of the security for the obligation is an important factor (see *Gibson Products Co. v. United States*, 637 F.2d at 1047-1049), it is of primary concern only at that stage of a transaction where the lender may proceed against the security (i.e., default or

---

[37]See also *Ramirez v. Commissioner*, T.C. Memo. 1982-608.

maturity). In *Siegel v. Commissioner, supra,* we stated (78 T.C. at 689):

Based on the provisions of the nonrecourse note here involved, it is clear that any payments of either principal or interest would only be made from the stated percentage of the gross receipts of the purchaser. Since the purchaser could keep and use the property for its entire useful life without any other payments, not only is there no economic incentive to make any further payment, but also it would be foolish for the purchaser to do so. Recognizing that the gross receipts of the purchaser are the only source of any payment on the note, as well as any profit for the purchaser, a reasonable projection of such receipts as of the date of purchase of the movie would be highly relevant in determining not only the fair market value of the movie but also whether any part of the principal of the nonrecourse note would ever be paid. * * *

We think that this is the appropriate approach, i.e., to look at the transaction based on the facts and circumstances at its inception—including reasonable revenue projections based on objective criteria and the value of the security at the time the lender has a right to proceed against the security for payment—and determine whether it is likely that the note will be paid. If we cannot conclude at the outset of the transaction that payment of the note is likely, then the note is too contingent to be recognized for tax purposes.

In our ultimate findings, we have determined that the fair market value during 1980 of a new Comp-U-Med System 107 Computer ECG Terminal was no more than $6,500. Our valuation is based on comparable terminals in light of Comp-U-Med's chosen market. Petitioners argue that the terminal was worth approximately $27,500, the stated purchase price. They rely on the 1980 and 1981 market prices for Hewlett-Packard (HP) and IBM ECG terminals. Petitioners start with the basic market prices for the HP and IBM terminals and factor in the costs (undiscounted) of service contracts on these terminals (which they analogize to Comp-U-Med's warranty provided as part of the purchase price) and the additional costs (again undiscounted) of various supplies necessary to administer ECG's (which petitioners contend Comp-U-Med provides at no charge). We disagree with petitioners' assertions, for various reasons.

First, we are not persuaded that the IBM and HP service contracts are really comparable to Comp-U-Med's warranty.

Comp-U-Med requires the terminals to be returned to it (shipping paid); the HP and IBM service contracts provide for work to be done on the customer's premises, substantially reducing down time. Moreover, Comp-U-Med's allocation of projected warranty costs on its books ($1,000) suggests that the cost of its warranty obligation is not nearly as great as petitioners contend. Second, as to the various supplies, the record does not clearly indicate what, if any, of these items that IBM and HP charge for are supplied by Comp-U-Med free of charge.

There are two even more compelling reasons why the IBM and HP terminals cannot be treated as comparable to Comp-U-Med's. Both IBM and HP are giants in the computer industry and were pioneers in the development of commercially viable computer programs and systems for ECG analysis. Comp-U-Med, by contrast, was a struggling, undercapitalized newcomer. IBM and HP had performance records and name recognition that enabled them to charge higher prices than companies like Comp-U-Med. Most important, however, is market comparability. IBM and HP manufactured and sold expensive equipment to high volume users, primarily large hospitals, who could afford to pay their high prices. Comp-U-Med, by contrast, chose to compete in the market for lower volume users, i.e., primarily individual physicians, clinics, and small hospitals. These users were unable to devote much capital to the acquisition of ECG analysis systems. Indeed, Comp-U-Med's marketing plan recognized that most of its targeted customers were unable or unwilling to make more than a nominal advance commitment of funds, which is why Comp-U-Med chose its fee-for-use approach. Having specifically chosen not to compete in IBM's and HP's market, Comp-U-Med (and petitioners herein) cannot now rely on prices in that noncomparable market to substantiate its own claimed value. Finally, we note that petitioners' reliance on IBM and HP prices is severely undermined by the subsequent pricing actions of the various companies. By 1983, IBM and HP had substantially *reduced* the prices for their ECG terminals; by contrast, Comp-U-Med's stated prices in 1981

and 1982 were *higher* than what it charged petitioners in 1980.[38]

We conclude that the value of the Comp-U-Med terminals must be measured within the market place in which Comp-U-Med franchisees competed for users, namely, the low volume user market. Phone-A-Gram and Telemed were Comp-U-Med's principal competitors. Although Phone-A-Gram was a primary competitor, Comp-U-Med's terminals were somewhat superior—they were faster because of their three-channel mode of transmission and because they did not require the cumbersome interposition of a human operator at the service bureau. The Telemed SR-200 was more comparable because it used a three-channel transmission mode but it was still somewhat inferior to the Comp-U-Med Model 107 because it was not portable. Telemed's 1983 price for its complete terminal unit was $4,750. Phone-A-Gram's 1980 and 1983 prices for its most comparable unit were $3,000 and $3,400, respectively. Based on all the evidence—looking at Phone-A-Gram and Telemed as the most comparable, and recognizing the superiority in certain respects of the Comp-U-Med terminal and the various additional supplies Comp-U-Med furnishes at no charge, and Comp-U-Med's 5-year warranty—we have concluded that the 1980 fair market value of Comp-U-Med Model 107 Computer ECG Terminal was no more than $6,500. We note that this figure also reflects a markup over Comp-U-Med's manufacturing costs of about 45 percent, comparable to Phone-A-Gram's markup of approximately 50 percent.

Looking at the value of petitioners' ECG terminals at both the date of purchase and the date of maturity of the purchase money note—the time it may reasonably be expected that Comp-U-Med would proceed against the terminal—it is readily apparent that the terminal was not adequate security. Even realization of the terminal's full initial value of $6,500 would pay barely 25 percent of the $25,000 principal indebtedness (without regard to any accrued interest). The actual value of the terminal at

---

[38]Indeed, by 1983, an IBM Model 5880 terminal sold for only $14,500; Comp-U-Med's last "stated" price for its terminal was $32,000. See note 5 *supra.* The IBM Model 5880 was superior to Comp-U-Med's Model 107 because of its internal minicomputer that obviated the need for access to an external mainframe computer.

maturity is less, probably in the range of $2,500 to $4,000.[39] Whatever the value of petitioners' franchise rights at the inception of the transaction, which also appear to have secured payment of the purchase money note, they will be valueless at maturity, for that is when the franchise rights terminate. Thus, under the terms of the purchase money note, its security (the terminal and franchise rights) is inadequate to justify a conclusion that the note is likely to be paid.

Similarly, looking at a reasonable, objective projection of revenues from petitioners' franchises, we must conclude that it is unlikely that the note will be paid. Although usage at the level projected in Comp-U-Med's offering circular (its own claimed average of 550 ECG's per year and the claimed national average of 1,500 ECG's per year) could repay the note (see appendix to findings of fact, tables 1, 2, and 10), these projections, while serving to bolster our factual determination as to petitioners' profit objective, were not objectively justifiable. Comp-U-Med's use of the Arthur D. Little report was itself inaccurate; the 1979 revision that Comp-U-Med's circular cited showed a nationwide average of only about 1,200 ECG's per year. More importantly, Comp-U-Med misused the Arthur D. Little statistics to inflate usage projections. The nationwide averages that Comp-U-Med cited included medium and large hospitals, high volume users for whose business Comp-U-Med and its franchisees would not be competing. Excluding these large volume users leaves a 1978 average of only 475 ECG's per year and a 1977 average of 704 ECG's per year. More importantly, the usage levels for individual physicians, the majority of potential Comp-U-Med users, shows lower average usage—556 ECG's per year in 1976, 417 per year in 1977, and 171 per year in 1978. These figures, as well as the total nationwide usage averages for these 3 years, also showed a declining average use per customer. Although *total* national usage perhaps could be projected to increase, it was misleading for Comp-U-Med to imply that

---

[39]Petitioners' expert testified that used Hewlett-Packard terminals can sell for as much as between 50 percent and 70 percent of the original price; it is reasonable to infer that by maturity of the note, a similar market for used Comp-U-Med terminals would exist. Comp-U-Med itself projected that a terminal would be worth about $2,750 at the end of the initial 7-year term.

per terminal usage would also increase, particularly in its market.

Comp-U-Med asserted in its offering circular, based on its own claimed experience, an annual average usage of 550 ECG's per terminal. Even assuming these figures are accurate (which we were willing to do only for purposes of determining the issue of petitioners' profit objective), it is interesting to note the breakdown: 45 percent had usage of less than 200, and another 29 percent had usage of from 200-600. Thus of 75 percent of the terminals, most could not generate enough revenues to pay off a purchase note according to its terms (a minimum average usage of 520 ECG's per year was required, see appendix, table l). Indeed, for the 46 percent that generated less than 200 ECG's per year, that would not even be sufficient to meet the minimum payments. (See appendix, tables 3 and 4). Coupling payment of principal from the exploitation proceeds with proceeds from the sale of the terminal at maturity does not materially aid petitioners' position. Even assuming a residual value of $4,000, a terminal would have to average 460 ECG's per year to pay the balance of the note. See appendix, table 8. Neither figure—460 or 520—was a reasonable forecast of actual average use. Moreover, the residual value of $4,000 does not include the costs a creditor like Comp-U-Med would undoubtedly incur in repossessing and reselling a terminal at the note's extended maturity.

Any reasonable, objective projection of ECG usage must begin with usage by the customers of Phone-A-Gram, one of Comp-U-Med's primary competitors in the low volume user market. Throughout the period of Comp-U-Med's franchise offering and the subsequent years in evidence, Phone-A-Gram's users averaged 150-200 ECG's per year. Under the transaction as structured in Comp-U-Med's franchise agreement and purchase money note, a franchisee whose user averaged between 200 and 300 ECG's per year would have trouble meeting the $1,500 minimum annual payments from his franchise revenues, much less making any meaningful payment of principal. (See appendix, tables 3 and 4.) Comp-U-Med's subsequent operations strongly corroborate the reasonableness of these lower projections. The most

recent Comp-U-Med data shows average usage per placed terminal in use of between 225 and 245 ECG's per year. This information also shows that barely 15 percent of Comp-U-Med's franchisees whose terminals were in place were generating usage at a level (over 360 ECG's per year) approaching that necessary for full payment, even when realization on the security at maturity of the note is factored in. See appendix, table 8. Excluding any residual value, barely 10 percent were generating usage near the required level (over 480 ECG's per year).[40] This low usage was further complicated by the substantial delays in obtaining initial placement of a franchisee's terminals with a user (14 to 20 months in petitioners' case, and potentially as much as 28 months). Delay in placement meant a shorter period during which a terminal could generate revenues and thus, a high usage level required for payment. By March of 1983, barely one-half of the terminals sold by Comp-U-Med had been placed with a user. We also note that at the end of 1982 over 60 percent of Comp-U-Med franchisees whose terminals had been placed were experiencing negative cash flow (i.e., net revenues inadequate to meet the minimum annual payments). Petitioners' own franchise operations were consistent with those of the majority of Comp-U-Med franchisees—delayed placement, low usage, and negative cash flow.[41]

---

[40]We reject petitioners' argument that the low usage levels are attributable to a startup period which requires several years before peak usage is met. First, the industry data suggests that average usage is declining. More importantly, Comp-U-Med's own experience contradicts petitioners' argument. In 1981, Comp-U-Med changed its terminals from an analog mode of transmission to digital. Consequently, Comp-U-Med's analog terminals were its oldest and thus would be placed with users first. If average usage indeed increases over time (up to the peak), as petitioners argue, one would expect that Comp-U-Med's analog terminals, older and placed earlier, would have had significantly higher average use levels than Comp-U-Med's new digital terminals. Comp-U-Med's most recent data (late fall of 1982), however, show that the average usage was slightly *higher* for the newer digital terminals than for the older analog terminals. This discrepancy cannot be explained away on the basis of quality, since neither analog nor digital transmission appears to be significantly better than the other. It may show, however, that even if analog models, such as petitioners purchased, are as good functionally as the newer digital models, that the users' perception of the newer models (Madison Avenue's traditional "new and improved" argot) may be otherwise, which would not bode well for petitioners' investment.

[41]Although petitioners' user contracts with General Foods and Alcoa offered higher potential usage, the more favorable rates granted these users meant that higher usage was required for full payment and to meet their minimum payments. See appendix, tables 5 to 7, 9. Moreover, even on the General Foods and Alcoa placements, petitioners had negative cash flow.

Given the market in which Comp-U-Med franchisees competed for users, it is clear that very few of them would have revenues that would substantially pay their purchase money notes. Payment of petitioners' note depended upon the unlikely chance of their securing a high volume user. Comp-U-Med itself recognized the contingent nature of the purchase money notes on its books, accruing only the present value of the minimum payments and conversion payments. See *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. at 848. We think this represents the economic substance of the financing transaction, not mere accounting conservatism as petitioners suggest. We must conclude that the likelihood of payment of the note according to its terms is simply too speculative for the note to be recognized for Federal tax purposes.

Since the $25,000 note is not a true indebtedness, the $1,500 minimum payments are not deductible interest for Federal tax purposes. *Norton v. Commissioner*, 474 F.2d 608, 610 (9th Cir. 1973), affg. per curiam a Memorandum Opinion of this Court; *Herrick v. Commissioner*, 85 T.C. at 260; *Surloff v. Commissioner*, 81 T.C. at 242; *Flowers v. Commissioner*, 80 T.C. at 942. Under the terms of the franchise agreement and purchase money note, however, these minimum payments are fixed and unconditional; default would not only permit Comp-U-Med to reach petitioners' individual assets for the $1,500 payment but would permit Comp-U-Med to accelerate all of the stated $25,000 principal. Similarly, the $1,000 conversion fee and $200 franchise renewal fee are mandatory if petitioners are to convert to nonrecourse, the rational choice for virtually all Comp-U-Med franchisees. It is thus virtually certain that these sums will be paid. To the extent of these required payments, we think that petitioners have incurred a bona fide indebtedness for Federal tax purposes.

Thus, in the present case with a portion that is bona fide indebtedness, we are effectively left with a recourse installment obligation without a stated interest rate. Application of the imputed interest rule of section 483 leaves a recourse loan in the discounted principal amount of approximately

$9,400. See secs. 483(a), (b); sec. 1.483-1(g)(2), tables IV, VI, Income Tax Regs. We leave to the parties in their Rule 155 computation to calculate the precise amount of the recourse installment obligation discounted under section 483.

Petitioners' total investment is thus approximately $15,400 (per franchise)—the $6,000 cash downpayment and the $9,400 of valid indebtedness. Although the documents allocate all of the purchase money note to petitioners' terminals, we conclude that a large portion of the note must be allocated to petitioners' franchise rights. The interrelationship of the franchise rights and the terminal is clear, and neither is nearly as valuable without the other. The main value of a franchisee's ECG terminal is the anticipated revenue stream from its placement with a user. It is the intangible rights granted under the franchise agreement that enable a franchisee to generate processing revenues. These franchise rights included unlimited access to Comp-U-Med's computers for ECG processing at a fixed charge, billing services at or about cost, access to Comp-U-Med's list of equipment distributors (initially independent, and later Comp-U-Med employees), Comp-U-Med's software improvements (through their access to Comp-U-Med's mainframe computers), Comp-U-Med's advertising to potential users, and Comp-U-Med's training of a user's personnel in use of the terminal. The right of access itself was of substantial value—franchisees paid Comp-U-Med a royalty of 50 cents per ECG, while charging users' fees on a downward sliding scale starting at $7 per ECG. (This was the rate recommended by Comp-U-Med and appears to reflect the market rate.) Conversely, these franchise rights were meaningless without an ECG terminal. We think that these franchise rights were worth far more than the $3,500 portion of the cash downpayment.[42] We are not bound to accept the allocation of a purchase price by a buyer and seller that does not accord with the economic realities of the transaction. *Schulz v. Commissioner*, 294 F. 2d 52, 56 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *F. & D. Rentals, Inc. v.*

---

[42]This represents the $500 franchise fee plus the $3,000 first-year royalty, which we have determined to be part of petitioners' franchise acquisition costs rather than an actual royalty. See part IB *supra*.

*Commissioner*, 44 T.C. 335, 345 (1965), affd. 365 F.2d 34, 40 (7th Cir. 1966), cert. denied 385 U.S. 1004 (1967). See also *Lemmen v. Commissioner*, 77 T.C. 1326, 1347-1350 (1981).

Moreover, a taxpayer's depreciable basis cannot exceed the property's fair market value. Accordingly, even where there is recourse indebtedness, a portion of a purchase price expressly allocated thereto must be reallocated to other property to limit the basis of the depreciable property to its fair market value. See *Lemmen v. Commissioner*, 77 T.C. at 1347-1348, and cases cited therein. Since we have determined that the fair market value of each of petitioners' ECG terminals was $6,500, that is the maximum extent of their depreciable basis in each terminal.

The balance of petitioners' $15,400 investment per franchise ($8,900) represents their expenses and their franchise acquisition costs.[43] They may amortize their franchise acquisition costs over the 14-year term of their franchises. An intangible asset, like petitioners' franchise rights, may be amortized if it has a reasonably ascertainable useful life. Sec. 167(a); sec. 1.167(a)-3, Income Tax Regs. Petitioners' franchises were for an initial term of 7 years and renewable for an additional 7 years. Both parties have presented their case on the assumption that petitioners would renew their franchises; Comp-U-Med's projections in the offering circular effectively requires renewal to repay the note. The convertibility of the note from "recourse" to nonrecourse also requires renewal. We think that renewal of the franchise was intended from the outset; consequently, petitioners' franchises have a useful life (duration) of 14 years. Petitioners are entitled to an amortization deduction for the year in issue beginning on December 30, 1980, the day Comp-U-Med approved their franchise application and the day they began their franchise venture. See also *Lemmen v. Commissioner*, 77 T.C. at 1352-1353, and cases cited therein. The parties should determine the amount of petitioners' amortization deduction in their Rule 155 computation.

---

[43]On the record in this case, we have concluded that Comp-U-Med and petitioners intended that the minimum payments of $1,500 would be paid, and while the record is not wholly clear, it seems to indicate that petitioners have in fact made those payments subsequent to 1980. Those later years are not before the Court. If the facts in later years were to show that petitioners or other investors in the Comp-U-Med franchise/terminal activity did not honor this obligation and that Comp-U-Med did not attempt to enforce the obligation, we would have to reexamine our conclusion in any future cases involving these Comp-U-Med investments.

## C. At Risk Rules

As in effect during the taxable year at issue, section 465 provided in pertinent part:

SEC. 465(a). LIMITATION TO AMOUNT AT RISK.—
  (1) IN GENERAL.—In the case of—
    (A) an individual,

       *     *     *     *     *     *     *

engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year.

       *     *     *     *     *     *     *

(b) AMOUNTS CONSIDERED AT RISK.—
  (1) IN GENERAL.—For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including—
    (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and
    (B) amounts borrowed with respect to such activity (as determined under paragraph (2)).
  (2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—
    (A) is personally liable for the repayment of such amounts, or
    (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).
No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

Petitioners' equipment leasing venture is subject to these at risk rules. Sec. 465(c).[44] Under these rules, petitioners' losses[45] from their ECG terminal franchises are limited to their amounts at risk in the activities. Although each of

---

[44]Sec. 465(c) provides that:

SEC. 465(c). ACTIVITIES TO WHICH SECTION APPLIES.—
  (1) TYPES OF ACTIVITIES.—This section applies to any taxpayer engaged in the activity of—

       *     *     *     *     *     *     *

    (C) leasing any section 1245 property (as defined in section 1245(a)(3)),

[45]Sec. 465(d) defines loss as follows:

SEC. 465(d). DEFINITION OF LOSS.—For purposes of this section, the term "loss" means the excess of the deductions allowable under this chapter for the taxable year (determined without regard to the first sentence of subsection (a)) and allocable to an activity to which this section applies over the income received or accrued by the taxpayer during the taxable year from such activity (determined without regard to subsection (e)(1)(A)).

petitioners' terminals and franchises is a separate activity for purposes of the at risk rules (sec. 465(c)(2)),[46] each venture is essentially identical at the outset. Section 465(b)(3)(A) and (b)(4) provides as follows:

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—

(A) has an interest (other than an interest as a creditor) in such activity, * * *

\*    \*    \*    \*    \*    \*    \*

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

We have determined that the bulk of petitioners' purchase money note is not to be treated as a bona fide debt for Federal tax purposes, and accordingly, petitioners are not at risk as to that portion of the note. Moreover, that portion of the $25,000 note that is not true indebtedness for Federal tax purposes would also fail under the at risk limitations of section 465(b)(4). In other words, the convertibility feature of the purchase money note constitutes a "stop loss agreement(s), or other similar arrangement" as to any obligation other than the minimum payments, conversion fee, and franchise renewal fee. See *Porreca v. Commissioner*, 86 T.C. 821 (1986), and *Capek v. Commissioner*, 86 T.C. 14 (1986). The stop-loss or other similar arrangements, and the legislative history of this limitation are discussed in depth in those cases and need not be repeated here.

However, even as to the portion of the purchase money note that we have determined to be bona fide indebtedness (the recourse loan in the discounted principal amount of approximately $9,400), there are problems under the at risk

---

[46]Sec. 465(c)(2) provides that:

(2) SEPARATE ACTIVITIES.—For purposes of this section, a taxpayer's activity with respect to each—

\*    \*    \*    \*    \*    \*    \*

(B) section 1245 property which is leased or held for leasing,

\*    \*    \*    \*    \*    \*    \*

shall be treated as a separate activity. * * *

rules. Borrowed amounts, even if recourse, are not considered at risk with respect to an activity if the lender has an interest in the activity other than as a creditor. The issue we must decide is whether Comp-U-Med, petitioners' recourse "lender" as to the $9,400, has an interest in petitioners' computerized ECG terminal franchise activity other than as a lender. We think that it did. Although we have determined that a large portion of petitioners' purchase money note is not to be treated as a bona fide debt for Federal tax purposes, nonetheless, Comp-U-Med has an enforceable right under the terms of its agreements with petitioners to at least 50 percent of petitioners' net profits from their franchises (in excess of the $1,500 minimum payment). This interest in petitioners' net profits is not a creditor's interest (for tax purposes). See General Explanation of the Tax Reform Act of 1976 (Joint Comm. on Taxation), 1976-3 C.B. (Vol. 2) 1, 51.[47] We are quite aware that the agreements between Comp-U-Med and petitioners provide that the 50 percent of petitioners' net profits that Comp-U-Med is to receive is to be applied against the $25,000 principal of the purchase money "indebtedness" for each terminal. We have also found that the fair market value of each terminal is $6,500, not $27,500. Comp-U-Med is simply sharing in any profits of the leasing operation as a coventurer with petitioners, rather than acting as a creditor.[48]

Accordingly, petitioners' amount at risk for the year before the Court is limited to their actual cash investment of $6,000 per franchise.

### III. Delinquency Addition

We sustain respondent's determination of the addition to

---

[47]See sec. 1.465-8, Proposed Income Tax Regs., 44 Fed. Reg. 32,238 (June 5, 1979).

[48]When and if any payments of any net profits are received by Comp-U-Med and applied against the principal of the note, petitioners' amount at risk may increase, and petitioners at that time may be able to obtain the benefit of any previously suspended losses from 1980. To some extent it seems to be only a matter of deferral of any bona fide loss. As explained by the Staff of the Joint Committee on Taxation:

"Losses which are suspended under this provision with respect to a taxpayer because they are greater than the taxpayer's investment which is "at risk" are to be treated as a deduction with respect to the activity in the following year. Consequently, if a taxpayer's amount at risk increases in later years, he will be able to obtain the benefit of previously suspended losses to the extent that such increases in his amount at risk exceed his losses in later years. [1976-3 C.B. (Vol. 2) 1, 48.]"

tax under section 6651(a) for the late filing of petitioners' return. Due April 15, 1981, petitioners' joint return was not filed until May 7, 1981. That their return was prepared by a tax professional does not of itself establish that the delinquency was due to reasonable cause and not due to willful neglect. *United States v. Boyle*, 465 U.S. 241, 105 S. Ct. 687 (1985). See *Magnon v. Commissioner*, 73 T.C. 980, 1006-1007 (1980); *Inter-American Life Insurance Co. v. Commissioner*, 56 T.C. 497, 511 (1971), affd. per curiam 469 F.2d 697 (9th Cir. 1972). Indeed, petitioners' accountant signed the return on April 14, 1981, before the return was due. Mr. Waddell did not sign until May 5, 1981. There is no explanation in the record for this 3-week delay. Petitioners have failed to carry their burden in regard to the late filing addition. See *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); *Fischer v. Commissioner*, 50 T.C. 164, 177 (1968).

*Decision will be entered under Rule 155.*